**THE HARBOR LAW GROUP**
Kira M. Rubel (WSBA No. 51691)
kira@theharborlawgroup.com
3615 Harborview Dr., Suite C
Gig Harbor, WA 98332
(253) 358-2215

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis (FL Bar No. 101754)*
ashamis@shamisgentile.com
14 NE 1st Ave, Suite 705
Miami, FL 33132
Tel: (305) 479-2299

**EDELSBERG LAW, PA**
Scott Edelsberg (FL Bar No. 100537)*
scott@edelsberglaw.com
20900 NE 30th Ave Ste 417
Aventura, FL 33180
Tel: 305-975-3320

*Pro Hac Vice forthcoming*
*Attorneys for Plaintiff and the Putative Class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| LISA EVANS, individually and on behalf of all others similarly situated,<br><br>     *Plaintiff*,<br><br>vs.<br><br>PROGRESSIVE CASUALTY INSURANCE COMPANY, an Ohio corporation,<br><br>     *Defendant*. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Lisa Evans ("Plaintiff"), by and through undersigned counsel, brings this class action, individually and on behalf of all others similarly situated, against Progressive Casualty Insurance Company ("Progressive" or "Defendant") and alleges as follows:

## INTRODUCTION

1.     This is a class action on behalf of Plaintiff and all other similarly situated claimants in Washington who received a payment for the loss of a totaled vehicle from Defendant, where Defendant used valuation reports prepared by Mitchell International, Inc. ("Mitchell") to determine the actual cash value ("ACV") of the loss vehicles.   Through Mitchell's valuation, Defendant systemically thumbs the scale when calculating the ACV of claimants' loss vehicles by applying so-called "Projected Sold Adjustments" that are: (a) arbitrary; (b) contrary to appraisal standards and methodologies; (c) not based in fact, as they are contrary to the used car industry's market pricing and inventory management practices; (d) not applied by the major competitor of Defendant's vendor Mitchell; and (e) on information and belief, not applied by Defendant and Mitchell to insureds in other states like California.

2.     In the event of a "total loss" to an insured vehicle—*i.e.*, where repair of the vehicle is impossible or uneconomical—Defendant's uniform insurance policies with Plaintiff and all putative Class members (defined below) promises to pay for the loss, limited to the ACV of the vehicle. Attached as Exhibit A is a copy of Plaintiff's Policy ("Policy"), which is materially identical to the policy for all members of the putative Class.

3.     When valuing total loss claims for vehicles, it is improper for an automobile insurance company, such as Progressive, to undervalue and underpay the claims by manipulating the data used to determine the ACV of the vehicles. Specifically, under their insurance policy terms and applicable Washington law, Defendant has a duty to pay, and represent that it will pay, the ACV of a loss vehicle when adjusting total loss claims.

4.     Notwithstanding these obligations and representations, Defendant fails to fulfill this obligation by taking advantage of a valuation process that employs improper and

unreasonable adjustments to reduce the value of comparable vehicles specified in the valuation reports, which in turn reduces the valuation of the total loss vehicles and the corresponding claim payment

5.     Specifically, Defendant, through Mitchell, systemically applies a so-called "Projected Sold Adjustment" that results in a significant downward adjustment to the base values of the comparable vehicles used to calculate the ACV of Plaintiff's and Class members' total loss vehicles. This reduction is contrary to appraisal standards and methodologies and is not based in fact, as it is contrary to the used car industry's market pricing and inventory management practices. The adjustment is applied to each of the comparable vehicles on top of adjustments for differences such as mileage, options, and equipment. The only purported explanation for the downward adjustment appears on the last page of the valuation reports and is a general, nondescript statement claiming that the reduction is to "reflect consumer purchasing behavior (negotiating a different price than the listed price)." Exhibit B at p. 8.

6.     Neither Progressive nor Mitchell has ever conducted any study or research to determine whether such "consumer purchasing behavior" exists and impacts ACV in the modern used-car market. Worse than this complete lack of curiosity is that Defendant thumbs the scale by discarding vast amounts of relevant data that contradict applying a Projected Sold Adjustment. For example, until July 2021, Defendant, through its vendors, simply threw out all data where the list price equaled or exceeded the sold price. And to this day, it persists in excluding from Projected Sold calculations some data where the list price equaled sold price and all data where the sold price exceeds the list price, even though examples abound of dealerships that charge more than advertised price to customers purchasing a vehicle with cash—i.e. not providing the dealer the opportunity to profit through financing the sale or acquiring a trade-in—which is

particularly relevant to the inquiry of determining a vehicle's ACV. Defendant fails to control for whether the vehicle was purchased with cash, or whether there were ancillary purchases or transactions that may influence the "sales price" but not the ACV (e.g., whether the customer traded in a vehicle at time of purchase, bought an extended warranty or service plan, or financed the purchase).

7.     Nevertheless, Progressive applies a Projected Sold Adjustment to the advertised (or listed) price of comparable vehicles when calculating the ACV of total-loss vehicles. For Plaintiff, the Projected Sold Adjustment was approximately 7.9% of each of the three comparable vehicle's value prior to adjustments. To arrive at the Projected Sold Adjustment amount, however, Progressive, through third-party vendors, and as set forth above, categorically excludes transactions that undermine its flawed thesis: for example, transactions where the sold price exceeds list price, transactions from dealerships who market themselves as "no-haggle" dealerships, and every transaction where the sold price equaled the advertised price.

8.     As explained herein, the used auto market is such that, given the ubiquity of Internet advertising and shopping and developments in sophisticated pricing software, car dealerships simply do not negotiate off of Internet-advertised prices. Any difference between a list and sales price does not reflect a negotiation of the vehicle's cash value, but rather that a dealer shifted its profits to other components of the transaction: for example, profits made through financing or trade-in or ancillary products described above, or that the dealer applied a generally unavailable discount to the cash value of the vehicle (such as employee discount, loyalty discount, military discount, or friends/family discount). But Progressive ignores these market realities and is content with paying insureds and claimants below-market prices for their totaled vehicles.

9.      To arrive at its conclusion that consumers negotiate down the advertised price, Progressive, through its vendors, intentionally distorts the data, excludes transactions that undercut its false hypothesis, and ignores market realities, all for the purpose of applying a capricious and unjustified Projected Sold Adjustment to artificially deflate the value of total loss vehicles.

10.     This pattern and practice of undervaluing comparable and total loss vehicles when paying automobile total loss claims through arbitrary, unsupported, and unjustified adjustments, which benefits the insurer at the expense of the insured, violates Defendant's policies with its insureds.

## **PARTIES**

11.     Plaintiff Lisa Evans, at all relevant times, was a citized of Washington State residing in Spokane County. At all relevant times, Plaintiff was contracted with Progressive for automobile insurance. On or about July 31, 2019, Plaintiff was in a car wreck and Defendant deemed her vehicle to be a total loss.

12.     Defendant Progressive Casualty Insurance Company is an Ohio company with its principal place of business in Ohio. Defendant is a subsidiary of Progressive Group entities. Defendant provides insurance coverage throughout the United States for first-party property damage under collision and/or comprehensive coverage. At all relevant times, Defendant conducted business in Washington through insurance agents and other company personnel.

## **JURISDICTION AND VENUE**

13.     Minimal diversity exists under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d), 1441(a)-(b), and 1453. Plaintiff and the proposed class members are citizens of the State of Washington. Defendant is an Ohio Corporation that has its corporate headquarters

in Ohio, and, at all relevant times hereto, Defendant was engaged in the business of marketing and selling insurance policies and adjusting insurance claims in the State of Washington.

14.     Plaintiff estimates that there are more than 100 putative class members, and the aggregate compensatory damages (in the amount of the Projected Sold Adjustment that were deceptively deducted), claimed by Plaintiff and the Class are estimated in good faith to exceed $5,000,000.00.

15.     Venue is proper in this District under 28 U.S.C. § 1391, as a substantial portion of the conduct giving rise to Plaintiff's claims occurred in this District, and Defendant transacts business in this District.

## **FACTUAL ALLEGATIONS**

Defendant's Systemic Application of Projected Sold Adjustments

16.     On July 31, 2019, Plaintiff was involved in a car wreck and sustained physical damage to her vehicle. At the time of the car wreck, Plaintiff was contracted with Progressive.

17.     Like all members of the putative Class, Plaintiff made a property damage claim to Defendant.

18.     Pursuant to uniform policies and procedures, Defendant declared Plaintiff's vehicle to be a total loss and purported to pay her the ACV of her loss vehicle, as Defendant promised and represented it would under the uniform provisions of its insurance policies and Washington law.

19.     When calculating its valuations and claims payments, Defendant systemically employs a routine "total loss settlement process." This process involves obtaining a "Vehicle Valuation Report" from Mitchell and relying upon the valuation provided by Mitchell as the ACV amount owed under the policy. Defendant provided a Mitchell Vehicle Valuation Report

to Plaintiff on August 1, 2019. *See* Exhibit B.

20.    The Mitchell Vehicle Valuation Reports used by Defendant during the relevant period followed the same process, provided and disclosed the same or substantially the same material information, and presented that material information in the same or substantially the same format. These valuation reports purport to contain values for comparable vehicles for sale in the claimant's geographic area. The reports also contain a purported valuation of the loss vehicle based upon these prices for comparable vehicles listed in the report. The report then adjusts the advertised prices of those comparable vehicles to account for differences in equipment, mileage, and vehicle configuration. Exhibit B at p. 8.

21.    In addition, however, the valuation reports used by Defendant make a further adjustment to each loss vehicle called a "Projected Sold Adjustment." For Plaintiff, Projected Sold Adjustments in the amounts of -$788.00, -$789.00, and - $1,021.00 respectively, were applied to each of the three comparable vehicles. Exhibit B at pp. 5-6.

22.    Defendant provides no data specific to the comparable vehicles or any explanation of industry practices in its valuation reports to support *any* Projected Sold Adjustment, much less the specific downward adjustments used in Plaintiff's valuation report. Instead, the *only* explanation is buried on the last page of each report, stating in full: "Projected Sold Adjustment – an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price)." Exhibit B at p. 8.

23.    In truth, Defendant's Projected Sold Adjustments do not reflect market realities (the context in which "consumer behavior" occurs) and run contrary to customary automobile dealer practices and inventory management, where list prices are priced to market to reflect the intense competition in the context of Internet pricing and comparison shopping. Before the

ubiquity of online advertising and shopping, "advertised" prices had very little to do with eliciting car buyers to particular dealerships—instead, car buyers generally went to their local used car dealership that had the desired vehicle in stock for sale. The "advertised" price was simply whatever price was listed on the physical window. And consumers could not, as they can now, easily compare that price to Internet advertisements of the same vehicle offered by competitors.

24.    As such, dealerships generally priced vehicles above market knowing that some consumers might be poor negotiators and they would realize an inflated profit on those sales. This above-market "window" price obviously allowed for negotiation, and a downward negotiation would often occur.

25.    But during the Class Period, that is simply no longer how the used car market operates. Now, given the need for Internet advertising, the prevalence of Internet shopping and consumer behavior, developments in sophisticated pricing software universally used by car dealerships, and the ease with which consumers can compare the advertised prices of identical vehicles across multiple competing dealerships, used car dealerships no longer price vehicles above market with room for—and the expectation of—negotiation. Instead, car dealerships use sophisticated pricing software—which provides the advertised prices of all competitors; the average "turn" of a given year, make and model; the amount for which vehicles have sold during a given time-period; etc.—and now appraise vehicles before acquiring them to price them to market and do not negotiate from that price.

26.    This makes sense, because if a car dealership priced a vehicle above market with room for negotiation, consumers would simply not go to that dealership. This is because consumers can easily compare advertised prices and would seek out the vehicle priced to market,

rather than the same vehicle priced at a higher amount (i.e., above market). Given the choice between paying less or paying more for an identical vehicle, consumers will choose to pay less.

27.    As such, a negotiated discount off the cash price is highly atypical and is not proper to include in determining ACV. The inclusion of this significant downward adjustment purportedly to "reflect consumer purchasing behavior" is particularly improper in the context of this action—insureds who have suffered a total loss of their vehicle and need to procure a replacement have limited time to search out the illusory opportunity to obtain the below-market deal Defendant assumes always exists without any explanation or support.

28.    Defendant's Projected Sold Adjustments are contrary to appraisal standards. There are multiple generally-recognized and acceptable methodologies for determining ACV, including use of comparable vehicles. Defendant begins the process of valuing loss vehicles using comparative methodology but improperly deviates from that process by thumbing the scales against the insured. Defendant documents the loss vehicle's and each comparable vehicle's mileage, options, and trim, which are compared in the report, and makes dollar adjustments accordingly. Plaintiff does not challenge these documented adjustments. At this stage of the process, however, Defendant abandons the comparative methodology and applies adjustments that are contrary to proper appraisal methodologies for determining ACV. Appraisers use advertised prices and make adjustments based only on observed and verifiable data; appraisal standards do not permit arbitrary adjustments from the advertised price based upon undocumented and unverifiable projections.

29.    Defendant thumbs the scale by discarding vast amounts of relevant data that contradict any application of a Projected Sold Adjustment and by failing to control for material variables, including whether there were ancillary purchases or transactions that may influence

what is recorded as the "sales price" but do not influence the ACV (e.g., whether the customer traded in a vehicle at the time of purchase, bought an extended warranty or service plan, or financed the purchase).

30.    Until July 2021, Defendant excluded from the calculation of the Projected Sold Adjustment all transactions in which the list price of a vehicle equaled the sold price.

31.    Even after July 2021, Defendant still excludes some transactions in which the list price of a vehicle equals the sold price.

32.    Defendant has excluded and continues to exclude from the calculation of the Projected Sold Adjustment all transactions in which the sold price of a vehicle is greater than the list price.

33.    Without having performed any investigation or study, Defendant simply assumes all such transactions are anomalies.

34.    Likewise, Defendant has not exercised even a modicum of curiosity to investigate whether market realities support the application of a Projected Sold Adjustment. Nor does Defendant or its vendors attempt to verify—even a single time—for those transactions where the advertised price exceeded sold price, whether the reason for the reduction was negotiation of the cash price of the vehicle and not some other (far more likely) reason, some of which are discussed herein.

35.    Neither Progressive's form Policy nor Washington law permit reducing a vehicle's value for invented or arbitrarily assumed justifications.

36.    Moreover, the accuracy of Defendant's data is, at best, suspect, as it contains a significant number of transactions where the advertised date in the database comes after the sold date. As a matter of simply chronology, it makes no sense to advertise a vehicle after it is sold.

But here, too, Defendant makes no effort to control for this obvious flaw in the data.

37.    These irremediable, and unjustifiable, errors, of course, skew the data in favor of Defendant to the detriment of the insureds.

38.    Moreover, examples abound demonstrating the glaring error of Defendant's cherry-picking practices.

39.    For example, related to the exclusion of sales prices greater than list prices, all advertised prices for comparable vehicles listed in Defendant's valuation reports are scraped from Internet sources—specifically Cars.com, Autotrader.com, Vast.com, and TrueCar.com.

40.    The advertised prices many dealerships publish on these websites include discounts for consumers who are financing and providing a trade-in. Thus, a consumer who was not financing the vehicle through the dealership or who was not trading in a vehicle—obviously, insureds who sustained a total loss almost certainly are not trading a vehicle when purchasing a replacement vehicle—would have to pay in cash more than the price listed on sources where Mitchell scrapes advertisements for comparable vehicles. In determining the ACV of Plaintiff's and class members' totaled vehicles, there is no justification for Defendant to have excluded those transactions from calculating the Projected Sold Adjustment, while only including transactions where the sold price was recorded as less than the list price.

41.    Simply put, there is no justification for Progressive to exclude such transactions as outliers or mistakes when justifying how it calculates the amount of the so-called Projected Sold Adjustment.

42.    Doing so serves only to skew the data to meet Defendant's unjustified, unsupported, and uninvestigated assumption that the list price of comparable vehicles should always be reduced to pay insureds less.

43.    Defendant further fails to control whether the vehicle was purchased with discounts unavailable to the public (e.g., employee discounts).

44.    Defendant also fails to control for whether the vehicle was purchased with cash, or whether there were ancillary purchases or transactions that may influence the recorded "sales price" but not the ACV (e.g., whether the customer traded in a vehicle at the time of purchase, bought an extended warranty or service plan, or financed the purchase).

45.    In these instances, the ACV of the vehicle remains its price to market; the dealership simply transferred the anticipated profit through either the sale of an optional ancillary product or by reducing what it would have offered in trade-in value.

46.    The impropriety and arbitrariness of Defendant's Projected Sold Adjustments are further demonstrated by the fact that Mitchell's primary competitor in providing valuation reports to insurance companies—CCC Intelligent Solutions, Inc.—does not apply projected sold adjustments in this manner. Instead, CCC Intelligent Solutions uses list prices.

47.    On information and belief, the impropriety and arbitrariness of Defendant's Projected Sold Adjustments are further demonstrated by the fact that Progressive does not apply these adjustments when determining the ACV of total losses in California or Washington. There is no justification for applying these adjustments when valuing total losses in Washington while not subjecting California insureds to the same negative adjustments.

48.    Plaintiff and each member of the proposed Class were damaged by Defendant's application of these Projected Sold Adjustments because they were not paid the ACV they would have received had Defendant applied proper methodologies and appraisal standards.

49.    Were it not for this deceptive and improper adjustment, the "Base Value" in each valuation report would have been higher, resulting in a higher "settlement value" and in turn a

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

higher payment by Defendant for ACV.  Specifically, for Plaintiff, were it not for this deceptive and improper adjustment, the payment of ACV by Defendant would have been $866.00 higher, before adding the related increase in payments for applicable sales taxes.

## **CLASS ACTION ALLEGATIONS**

50.    Plaintiff brings this action individually and as a class action under Fed. R. Civ. P 23(a) and (b), on behalf of the following proposed Class:

> All Washington citizens insured by Progressive who, from the earliest allowable time through the date an Order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on a vehicle valuation report prepared by Mitchell and the ACV was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine ACV.

51.    Plaintiff is the proposed class representative for the Class. Excluded from the Class are Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Judge(s) and Court staff assigned to this case and their immediate family members.

52.    Plaintiff reserves her right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded or narrowed, divided into additional subclasses, or modified in any other way.

53.    **Numerosity.** The members of the Class are so numerous that individual joinder of all Class members is impracticable. While Plaintiff is informed and believes that there are thousands of Class members, the precise number is unknown to Plaintiff but may be ascertained from Defendant's books and records. Class members may be notified of the pendency of this action by recognized Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

54.     **Commonality and Predominance.** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

      a.   Whether Defendant systemically used Mitchell's Vehicle Valuation Reports in adjusting total loss claims to determine ACV;

      b.   Whether the Mitchell Vehicle Valuation Reports included Projected Sold Adjustments to the value of the comparable vehicles that reduced the base value, and thus the claim amount paid by Defendant for the ACV of Plaintiff's and Class members' total loss vehicles;

      c.   Whether Defendant's improper practices injured Plaintiff and members of the Class;

      d.   Whether Defendant's acts violated its obligations under the policy of insurance;

      e.   Whether Plaintiff and the Class are entitled to compensatory damages, and if so, the calculation of damages; and

      f.   Whether Plaintiff and Class members are entitled to an injunction restraining Progressive's future acts and practices.

55.     **Typicality.** The claims of the Plaintiff, who is the representative of the Class herein, are typical of the claims of the proposed Class, in that the claims of all members of the proposed Class, including the Plaintiff, depend on a showing of the acts of Progressive giving rise to the right of Plaintiff to the relief sought herein. There is no conflict between the individually named Plaintiff and the other members of the proposed Class with respect to this action, or with respect to the claims for relief set forth herein.

56.     **Adequacy of Representation.** Plaintiff is an adequate representative of the Class

because Plaintiff's interests do not conflict with the interests of the other Class members whom she seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

57.    **Superiority.** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, such that it would be impracticable for the Class members to individually seek redress for Defendant's wrongful conduct. Even if the Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT 1
## VIOLATION OF THE WASHINGTON UNFAIR TRADE PRACTICES ACT
### WASH. REV. CODE § 19.86.010, *et seq.*

58.    Plaintiff hereby repeats and realleges all preceding paragraphs contained herein.

59.    This claim is brought by Plaintiff on behalf of the class.

60.    Defendant, Plaintiff, and the Class members are "persons" within the meaning of Wash. Rev. Code § 19.86.010(1).

61.    Defendant was and is engaged in "trade" or "commerce" within the meaning of

1

Wash. Rev. Code § 19.86.010(2).

2      62.    The Washington Unfair Trade Practices Act ("Washington UTPA") prohibits

3  "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any

4  trade or commerce" Wash. Rev. Code § 19.86.020.

5      63.    As alleged herein, Defendant, through its agents, employees, and/or subsidiaries,

6  violated the Washington UTPA by knowingly and intentionally concealing and failing to

7  disclose material facts regarding its application of an arbitrary Projected Sold Adjustment to

8  comparable vehicles in order to reduce their market value and, as a result, the amount of

9  Defendant's total-loss payments to insureds, as detailed above.

10     64.    By knowingly and intentionally misrepresenting, omitting, concealing, and

11  failing to disclose material facts regarding its application of an arbitrary Projected Sold

12  Adjustment to comparable vehicles, as detailed above, Defendant engaged in one or more unfair

13  or deceptive business practices prohibited by the Washington UTPA.

14     65.    Defendant's misrepresentations and omissions regarding its application of an

15  arbitrary Projected Sold Adjustment to comparable vehicles were made to Plaintiff and the Class

16  members in a uniform manner.

17     66.    Defendant's unfair or deceptive acts or practices, including its

18  misrepresentations, concealments, omissions, and suppression of material facts, as alleged

19  herein, had a tendency or capacity to mislead and create a false impression in consumers' minds,

20  and were likely to, and in fact did, deceive reasonable consumers, including Plaintiff and the

21  Class members, about Defendant's application of an arbitrary Projected Sold Adjustment to

22  comparable vehicles in order to reduce the amount of Defendant's total-loss payments to its

23  insureds.

67.     The facts regarding Defendant's application of an arbitrary Projected Sold Adjustment to comparable vehicles that Defendant knowingly and intentionally misrepresented, omitted, concealed, and/or failed to disclose would be considered material by a reasonable consumer, and they were, in fact, material to Plaintiff and the Class members, who consider such facts to be important to their purchase decisions with respect to Defendant's insurance coverage.

68.     Plaintiff and Class members had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose. Plaintiff and Class members did not, and could not, unravel Defendant's deception on their own.

69.     Defendant had an ongoing duty to Plaintiff and the Class members to refrain from engaging in unfair or deceptive practices under the Washington UTPA in the course of its business. Specifically, Defendant owed Plaintiff and Class members a duty to disclose all the material facts concerning its application of an arbitrary Projected Sold Adjustment to comparable vehicles because Defendant possessed exclusive knowledge of those facts, it intentionally concealed those facts from Plaintiff and the Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

70.     Plaintiff and the Class members were aggrieved by Defendant's violations of the Washington UTPA because they suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's knowing and intentional misrepresentations, omissions, concealments, and failures to disclose material facts regarding its application of an arbitrary Projected Sold Adjustment to comparable vehicles, including that the Projected Sold

Adjustment is arbitrarily selected and applied, in an inconsistent manner designed to decrease Defendant's total-loss payments under the Policy.

71.     Plaintiff and the Class members purchased Defendant's insurance coverage in reliance on Defendant's misrepresentations, omissions, concealments, and/or failures to disclose material facts regarding its purported payment of ACV in the event of a total loss and Defendant's application of an arbitrary Projected Sold Adjustment to comparable vehicles to artificially reduce its total-loss payments to insureds.

72.     Had Defendant not engaged in the deceptive acts and practices alleged herein, Plaintiff and Class members would not have purchased insurance coverage from Defendant, or would not have paid as much for it and, thus, they did not receive the benefit of the bargain and/or they suffered out-of-pocket loss.

73.     Defendant's violations of the Washington UTPA present a continuing risk of future harm to Plaintiff and the Class members.

74.     Plaintiff and the Class members seek an order enjoining Defendant's unfair and deceptive acts or practices in violation of the Washington UTPA and awarding actual damages or, in the Court's discretion, treble damages as permitted by law, costs, attorneys' fees, and any other just and proper relief available under the Washington UTPA.

**COUNT 2**
**BREACH OF CONTRACT**

75.     Plaintiff hereby repeats and realleges all preceding paragraphs contained herein.

76.     This claim is brought by Plaintiff on behalf of the Class.

77.     Plaintiff made a claim for property damage on her Progressive insurance policy.

78.     At the time of her claim, and in the time since, Plaintiff has performed all obligations under her policy of insurance and was entitled to the benefits she contracted for in

her policy.

79.     Through the use of improper and unfounded Projected Sold Adjustments in Mitchell vehicle valuation reports, as detailed above, Defendant handled, adjusted, and paid Plaintiff's claim, and the claims of the members of the proposed Class, for less than the ACV required by the insurance contract, in breach of said contract.

80.     As a direct result of Defendant's breaches, Plaintiff and members of the Class sustained actual damages. Plaintiff's damages are at least $866.00 (before calculation of additional sales tax benefits), plus pre-judgment and post-judgment interest.

### COUNT 3
### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

81.     Plaintiff hereby repeats and realleges all preceding paragraphs contained herein.

82.     This claim is brought by Plaintiff on behalf of the Class.

83.     Every contract, including the Policy, contains an implied covenant of good faith and fair dealing. The purpose of this duty is to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract.

84.     Disputes involving the exercise of good faith arise when one party is given broad discretion in performing its obligations under the contract. Where a contract specifically vests one of the parties with broad discretion in performing a term of the contract, the covenant of good faith and fair dealing requires that the discretion be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

85.     To the extent the Policy provides Defendant with in calculating the ACV of an insured's total-loss vehicle, Defendant exercised its discretion unreasonably, with an improper

1

2

3

motive, and in a manner that was arbitrary, capricious, and inconsistent with the reasonable expectations of the parties, specifically, to arbitrarily reduce the amount of their total-loss payments to insureds, as alleged herein.

4

5

6

7

86.    Defendant breached the covenant of good faith and fair dealing by, *inter alia*:

a.  Intentionally inventing and applying Projected Sold Adjustments to undervalue comparable vehicles, and, in turn, insureds' total-loss vehicles;

8

9

10

11

b.  Failing to conduct ***any*** investigation or study or research into whether the Projected Sold Adjustment (i) reflects the used auto market, (ii) is based on accurate data or extrapolations, (iii) is consistent with accepted appraisal methods and practices, or (iv) has any justification whatsoever;

12

13

c.  Failing to pay insureds the ACV of their total-loss vehicles;

14

15

16

d.  Interpreting the terms and conditions of their insurance policies in an unreasonable manner solely in an effort to understate the value of total- loss vehicles and avoid paying insureds the ACV on their total-loss claims;

17

18

e.  Inventing spurious grounds for undervaluing total loss claims that are hidden, not specific in dollar amount, not adequately explained, and unreasonable.

19

20

21

22

23

87.    Defendant's breaches of the covenant of good faith and fair dealing have caused damages to Plaintiff and the Class. Plaintiff's and the Class members' damages include the amounts improperly deducted by Defendant from its payments to insureds on the basis of a Projected Sold Adjustment.

24

25

**COUNT 4**
**DECLARATORY JUDGMENT**

26

88.    Plaintiff hereby repeats and realleges all preceding paragraphs contained herein.

27

89.    This claim is brought by Plaintiff on behalf of the Class.

28

90.    A judiciable dispute between Plaintiff and the proposed Class and the Defendant is before this Court under 28 U.S.C. § 2201, *et seq.*, concerning the construction of the auto insurance policies issued by Defendant and the rights arising under those policies.

91.    Plaintiff, for herself and on behalf of the Class, seeks a declaration of rights and liabilities of the parties herein. Specifically, Plaintiff is seeking a declaration that in paying total loss claims with first-party insureds, it is a breach of the insurance contract with Progressive for Progressive to base the valuation and payment of claims on values of comparable vehicles that have been reduced by factually erroneous Projected Sold Adjustments.

92.    Progressive's unlawful common policy and general business practice of applying Projected Sold Adjustments is ongoing. Accordingly, Progressive has breached, and continues to breach, the express terms of its contracts of insurance with Plaintiff and members of the Class requiring it to settle total loss claims on the basis of the total loss vehicle's ACV.

93.    As a result of these breaches of contract, Plaintiff and the proposed Class members have been injured. Plaintiff's and proposed Class members' damages include the amounts illegally deducted by Progressive from the insureds' payments.

94.    Plaintiff seeks a declaration that Progressive's application of unfounded Projected Sold Adjustments results in a valuation of less than the ACV Progressive is required under its insurance contracts to pay insureds.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court:

a)     determine that this action may be maintained as a class action under Federal Rule of Civil Procedure 23, certify the proposed Class for class treatment, appoint Plaintiff as class representative for the Class, and appoint undersigned counsel as Class Counsel;

b)     enter an order finding that Defendant's actions described herein constitute breaches of the express terms of its policies of insurance;

c)     award Plaintiff and members of the Class actual damages according to proof;

d)     enter a declaratory judgment that in paying total loss claims with first-party insureds, it is a breach of the insurance contract with Defendant for Defendant to base the valuation and payment of claims on values of comparable vehicles that have been reduced by Projected Sold Adjustments;

e)     enter further belief based on the declaratory judgment including an order enjoining Defendant from basing the valuation and payment of claims on values of comparable vehicles that have been reduced by Projected Sold Adjustments;

f)     award pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

g)     award reasonable attorney's fees and litigation costs and expenses pursuant to applicable law; and

h)     grant such other legal and equitable relief as the Court may deem appropriate, including specific performance as an alternative to damages.

Dated: August 25, 2022                     Respectfully submitted,


**THE HARBOR LAW GROUP**

/s/ Kira M. Rubel
Kira M. Rubel, WSBA No. 51691
kira@theharborlawgroup.com
3615 Harborview Dr., Suite C
Gig Harbor, WA 98332
(253) 358-2215

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis*
ashamis@shamisgentile.com
14 NE 1st Ave, Suite 705
Miami, FL 33132
Tel: (305) 479-2299

**EDELSBERG LAW, PA**
Scott Edelsberg*
scott@edelsberglaw.com
20900 NE 30th Ave Ste 417
Aventura, FL 33180
Tel: 305-975-3320

*Pro Hac Vice forthcoming*

*Attorneys for Plaintiff and the Putative
Class*

# EXHIBIT A

9611A WA 0716

# WASHINGTON
## AUTO POLICY

Form 9611A WA (07/16)
version 2.0



# CONTENTS

**INSURING AGREEMENT** ................................................................................. 1

**GENERAL DEFINITIONS** ............................................................................... 1

**PART I—LIABILITY TO OTHERS**

    Insuring Agreement ....................................................................................3
    Additional Definitions..................................................................................3
    Additional Payments...................................................................................3
    Exclusions ..................................................................................................4
    Limits of Liability........................................................................................5
    Financial Responsibility Laws ...................................................................6
    Other Insurance ........................................................................................6
    Out-of-State Coverage ..............................................................................6

**PART II—PERSONAL INJURY PROTECTION COVERAGE**

    Insuring Agreement ...................................................................................7
    Additional Definitions..................................................................................7
    Exclusions ..................................................................................................8
    Limits of Liability........................................................................................9
    Other Insurance ........................................................................................9
    Arbitration................................................................................................10

**PART III—UNDERINSURED MOTORIST COVERAGE**

    Insuring Agreement—Underinsured Motorist Bodily Injury Coverage ....... 10
    Insuring Agreement—Underinsured Motorist Property
      Damage Coverage ................................................................................10
    Additional Definitions................................................................................11
    Exclusions ................................................................................................12
    Limits of Liability......................................................................................13
    Other Insurance ......................................................................................14
    Arbitration................................................................................................14

**PART IV—DAMAGE TO A VEHICLE**

    Insuring Agreement—Collision Coverage ................................................15
    Insuring Agreement—Comprehensive Coverage .....................................15
    Insuring Agreement—Additional Custom Parts or
      Equipment Coverage ............................................................................16
    Insuring Agreement—Rental Reimbursement Coverage...........................16
    Insuring Agreement—Loan/Lease Payoff Coverage ................................17
    Insuring Agreement—Pet Injury Coverage...............................................18
    Additional Definitions................................................................................18
    Exclusions ................................................................................................18
    Limits of Liability......................................................................................20
    Payment of Loss......................................................................................21

No Benefit to Bailee .................................................................................22
Loss Payable Clause ..............................................................................22
Other Sources of Recovery .....................................................................23
Appraisal .................................................................................................23

**PART V—ROADSIDE ASSISTANCE COVERAGE**

Insuring Agreement .................................................................................23
Additional Definitions ..............................................................................24
Exclusions ...............................................................................................24
Unauthorized Service Provider ................................................................25
Other Insurance ......................................................................................25

**PART VI—DUTIES IN CASE OF AN ACCIDENT OR LOSS** ...........................25

**PART VII—GENERAL PROVISIONS**

Policy Period and Territory .......................................................................26
Changes ..................................................................................................26
Duty to Report Changes ..........................................................................27
Settlement of Claims ...............................................................................27
Terms of Policy Conformed to Statutes ...................................................27
Transfer of Interest ..................................................................................27
Fraud or Misrepresentation .....................................................................27
Payment of Premium and Fees ...............................................................28
Cancellation ............................................................................................28
Cancellation Refund ................................................................................29
Nonrenewal .............................................................................................29
Automatic Termination .............................................................................30
Legal Action Against Us ..........................................................................30
Our Rights to Recover Payment ..............................................................30
Joint and Individual Interests ...................................................................31
Bankruptcy ..............................................................................................31

## INSURING AGREEMENT

In return for **your** payment of the premium, **we** agree to insure **you** subject to all the terms, conditions and limitations of this policy. **We** will insure **you** for the coverages and the limits of liability shown on this policy's **declarations page**. **Your** policy consists of the policy contract, **your** insurance application, the **declarations page**, and all endorsements to this policy.

## GENERAL DEFINITIONS

The following definitions apply throughout the policy. Defined terms are printed in boldface type and have the same meaning whether in the singular, plural, or any other form.

1. "**Additional auto**" means an **auto you** become the owner of during the policy period that does not permanently replace an **auto** shown on the **declarations page** if:
   a. **we** insure all other **autos you** own;
   b. the **additional auto** is not covered by any other insurance policy;
   c. **you** notify **us** within 30 days of becoming the owner of the **additional auto**; and
   d. **you** pay any additional premium due.

   An **additional auto** will have the broadest coverage **we** provide for any **auto** shown on the **declarations page**. If **you** ask **us** to insure an **additional auto** more than 30 days after **you** become the owner, any coverage **we** provide will begin at the time **you** request coverage.

2. "**Auto**" means a land motor vehicle:
   a. of the private passenger, pickup body, or cargo van type;
   b. designed for operation principally upon public roads;
   c. with at least four wheels; and
   d. with a gross vehicle weight rating of 12,000 pounds or less, according to the manufacturer's specifications.

   However, "**auto**" does not include step-vans, parcel delivery vans, or cargo cutaway vans or other vans with cabs separate from the cargo area.

3. "**Auto business**" means the business of selling, leasing, repairing, parking, storing, servicing, delivering or testing vehicles.

4. "**Bodily injury**" means bodily harm, sickness, or disease, including death that results from bodily harm, sickness, or disease.

5. "**Covered auto**" means:
   a. any **auto** or **trailer** shown on the **declarations page** for the coverages applicable to that **auto** or **trailer**;
   b. any **additional auto**;
   c. any **replacement auto**; or
   d. a **trailer** owned by **you**.

6. "**Declarations page**" means the document showing **your** coverages, limits of liability, **covered autos**, premium, and other policy-related information. The **declarations page** may also be referred to as the Auto Insurance Coverage Summary.

1

7. "**Occupying**" means in, on, entering or exiting.

8. "**Personal vehicle sharing program**" means a system or process, operated by a business, organization, network, group, or individual, that facilitates the sharing of private passenger motor vehicles for use by individuals, businesses, or other entities.

9. "**Rated resident**" means a person residing in the same household as **you** at the time of the loss who is not a **relative**, but only if that person is both:
   a. listed in the "Drivers and household residents" section on the **declarations page**; and
   b. not designated as either an "Excluded" or a "List Only" driver.

10. "**Relative**" means a person residing in the same household as **you**, and related to **you** by blood, marriage, domestic partnership pursuant to Washington law, or adoption, and includes a ward, stepchild, or foster child. **Your** unmarried dependent children temporarily away from home will qualify as a **relative** if they intend to continue to reside in **your** household.

11. "**Replacement auto**" means an **auto** that permanently replaces an **auto** shown on the **declarations page**. A **replacement auto** will have the same coverage as the **auto** it replaces if the **replacement auto** is not covered by any other insurance policy. However, if the **auto** being replaced had coverage under Part IV—Damage To A Vehicle, such coverage will apply to the **replacement auto** only during the first 30 days after **you** become the owner unless **you** notify **us** within that 30-day period that **you** want **us** to extend coverage beyond the initial 30 days. If the **auto** being replaced did not have coverage under Part IV—Damage To A Vehicle, such coverage may be added, but the **replacement auto** will have no coverage under Part IV until **you** notify **us** of the **replacement auto** and ask **us** to add the coverage.

12. "**Ride-sharing activity**" means the use of any vehicle to provide transportation of persons or property in connection with a **transportation network company** from the time a user logs on to, or signs in to, any online-enabled application, software, website or system until the time the user logs out of, or signs off of, any such online-enabled application, software, website or system, whether or not the user has accepted any passenger(s) or delivery assignment, including the time the user is on the way to pick up any passenger(s) or property, or is transporting any passenger(s) or property.

13. "**Trailer**" means a non-motorized trailer, including a farm wagon or farm implement, designed to be towed on public roads by an **auto** and not being used:
    a. for commercial purposes;
    b. as an office, store, or for display purposes; or
    c. as a passenger conveyance.

14. "**Transportation network company**" means a corporation, partnership, sole proprietorship, or other entity that uses any online-enabled application, software, website or system to connect drivers with clients or passengers to facilitate and/or provide transportation or delivery services for compensation or a fee.

15. "**We**," "**us**" and "**our**" mean the underwriting company providing the insurance, as shown on the **declarations page**.

16. "**You**" and "**your**" mean:
    a. a person shown as a named insured on the **declarations page**; and

2

b. the following person, if residing in the same household as a named insured at the time of the loss.
   (i) the spouse of a named insured; or
   (ii) a person who has entered into a domestic partnership with a named insured pursuant to Washington law.

## PART I—LIABILITY TO OTHERS

### INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay damages for **bodily injury** and **property damage** for which an **insured person** becomes legally responsible because of an accident.

Damages include prejudgment interest awarded against an **insured person**.

**We** will settle or defend, at **our** option, any claim for damages covered by this Part I.

### ADDITIONAL DEFINITIONS

When used in this Part I:
1. "**Insured person**" means:
   a. **you**, a **relative**, or a **rated resident** with respect to an accident arising out of the ownership, maintenance or use of an **auto** or a **trailer**;
   b. any person with respect to an accident arising out of that person's use of a **covered auto** with the permission of **you**, a **relative**, or a **rated resident**;
   c. any person or organization with respect only to vicarious liability for the acts or omissions of a person described in a. or b. above; and
   d. any "Additional Interest" shown on the **declarations page** with respect only to its liability for the acts or omissions of a person described in a. or b. above.
2. "**Property damage**" means physical damage to, destruction of, or loss of use of, tangible property.

### ADDITIONAL PAYMENTS

In addition to **our** limit of liability, **we** will pay for an **insured person**:
1. all expenses **we** incur in the settlement of any claim or defense of any lawsuit;
2. interest accruing after entry of judgment, until **we** have paid, offered to pay, or deposited in court, that portion of the judgment which does not exceed **our** limit of liability. This does not apply if **we** have not been given notice of suit or the opportunity to defend an **insured person**;
3. the premium on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in an amount exceeding **our** limit of liability, and **we** have no duty to apply for or furnish these bonds;
4. up to $250 for a bail bond required because of an accident resulting in **bodily injury** or **property damage** covered under this Part I. **We** have no duty to apply for or furnish this bond; and

3

5. reasonable expenses, including loss of earnings up to \$200 per day, incurred at **our** request.

**EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EX- CLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART I.**

Coverage under this Part I, including **our** duty to defend, will not apply to any **insured person** for:
1. **bodily injury** or **property damage** arising out of the ownership, maintenance or use of any vehicle or trailer while being used:
   a. to carry persons or property for compensation or a fee;
   b. for retail or wholesale delivery, including, but not limited to, the pickup, transport or delivery of magazines, newspapers, mail or food; or
   c. for **ride-sharing activity**.
   This exclusion does not apply to shared-expense car pools;
2. any liability assumed under any contract or agreement by **you**, a **relative**, or a **rated resident**;
3. **bodily injury** to an employee of that **insured person** arising out of or within the course of employment. This exclusion does not apply to domestic employees if benefits are neither paid nor required to be provided under workers' compensation, disability benefits, or similar laws;
4. **bodily injury** or **property damage** arising out of an accident involving any vehicle while being maintained or used by a person while employed or engaged in any **auto business**. This exclusion does not apply to **you**, a **relative**, a **rated resident**, or an agent or employee of **you**, a **relative**, or a **rated resident**, when using a **covered auto**;
5. **bodily injury** or **property damage** resulting from, or sustained during practice or preparation for:
   a. any pre-arranged or organized racing, stunting, speed or demolition contest or activity; or
   b. any driving activity conducted on a permanent or temporary racetrack or race- course;
6. **bodily injury** or **property damage** due to a nuclear reaction or radiation;
7. **bodily injury** or **property damage** for which insurance:
   a. is afforded under a nuclear energy liability insurance contract; or
   b. would be afforded under a nuclear energy liability insurance contract but for its termination upon exhaustion of its limit of liability;
8. any obligation for which the United States Government is liable under the Federal Tort Claims Act;
9. **bodily injury** or **property damage** caused by an intentional act of that **insured person**, or at the direction of that **insured person**, even if the actual injury or dam- age is different than that which was intended or expected;
10. **property damage** to any property owned by, rented to, being transported by, used by, or in the charge of that **insured person**. This exclusion does not apply to a rented residence or a rented garage;

4

11. **bodily injury** or **property damage** arising out of the ownership, maintenance or use of any vehicle owned by **you** or furnished or available for **your** regular use, other than a **covered auto** for which this coverage has been purchased;

12. **bodily injury** or **property damage** arising out of the ownership, maintenance or use of any vehicle owned by a **relative** or a **rated resident** or furnished or available for the regular use of a **relative** or a **rated resident**, other than a **covered auto** for which this coverage has been purchased. This exclusion does not apply to **your** maintenance or use of such vehicle;

13. **bodily injury** or **property damage** arising out of **your**, a **relative's**, or a **rated resident's** use of a vehicle, other than a **covered auto**, without the permission of the owner of the vehicle or the person in lawful possession of the vehicle;

14. **bodily injury** or **property damage** arising out of the use of a **covered auto** while leased or rented to others or given in exchange for any compensation, including while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**; or

15. punitive or exemplary damages.

## LIMITS OF LIABILITY

The limit of liability shown on the **declarations page** for liability coverage is the most **we** will pay regardless of the number of:
1. claims made;
2. **covered autos**;
3. **insured persons**;
4. lawsuits brought;
5. vehicles involved in the accident; or
6. premiums paid.

If **your declarations page** shows a split limit:
1. the amount shown for "each person" is the most **we** will pay for all damages due to **bodily injury** to one person resulting from any one accident;
2. subject to the "each person" limit, the amount shown for "each accident" is the most **we** will pay for all damages due to **bodily injury** sustained by two or more persons in any one accident; and
3. the amount shown for "property damage" is the most **we** will pay for the total of all **property damage** resulting from any one accident.

The "each person" limit of liability applies to the total of all claims made for **bodily injury** to a person and all claims of others derived from such **bodily injury**, including, but not limited to, emotional injury or mental anguish resulting from the **bodily injury** of another or from witnessing the **bodily injury** to another, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

If the **declarations page** shows that "combined single limit" or "CSL" applies, the amount shown is the most **we** will pay for the total of all damages resulting from any

5

one accident. However, without changing this limit of liability, **we** will comply with any law that requires **us** to provide any separate limits.

No one is entitled to duplicate payments for the same elements of damages.

Any payment under this Part I to a person other than **you**, a **relative**, or a **rated resident** will be reduced by any payment to that person under Part III—Underinsured Motorist Coverage.

**We** will not pay under this Part I any expenses paid or payable under Part II—Personal Injury Protection Coverage.

If multiple auto policies issued by **us** are in effect for **you**, **we** will pay no more than the highest limit of liability for this coverage available under any one policy.

An **auto** and attached **trailer** are considered one **auto**. Therefore, the limits of liability will not be increased for an accident involving an **auto** that has an attached **trailer**.

## FINANCIAL RESPONSIBILITY LAWS

When **we** certify this policy as proof of financial responsibility, this policy will comply with the law to the extent required. The **insured person** must reimburse **us** if **we** make a payment that **we** would not have made if this policy was not certified as proof of financial responsibility.

## OTHER INSURANCE

If there is any other applicable liability insurance or bond, any liability insurance **we** provide will be excess over any other applicable liability insurance or bond. If more than one liability insurance policy or bond applies on an excess basis, **we** will pay only **our** share of the damages. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits.

## OUT-OF-STATE COVERAGE

If an accident to which this Part I applies occurs in any state, territory or possession of the United States of America or any province or territory of Canada, other than the one in which a **covered auto** is principally garaged, and the state, province, territory or possession has:
1. a financial responsibility or similar law requiring limits of liability for **bodily injury** or **property damage** higher than the limits shown on the **declarations page**, this policy will provide the higher limits; or
2. a compulsory insurance or similar law requiring a non-resident to maintain insurance whenever the non-resident uses an **auto** in that state, province, territory or possession, this policy will provide the greater of:
   a. the required minimum amounts and types of coverage; or
   b. the limits of liability under this policy.

6

## INSURING AGREEMENT

Subject to the Limits of Liability, if **you** pay the premium for Personal Injury Protection Coverage, **we** will pay the following benefits to or on behalf of an **insured person** for losses or expenses incurred because of **bodily injury** sustained by an **insured person** caused by an accident and arising out of the ownership, operation, maintenance, or use of an **automobile**:

1. **medical and hospital benefits**;
2. **income continuation benefits** to or on behalf of each **insured person** engaged in a remunerative occupation at the time of the accident;
3. **funeral expenses**; and
4. **loss of services benefits**.

## ADDITIONAL DEFINITIONS

When used in this Part II:

1. "**Automobile**" means a motor vehicle designed for carrying 10 passengers or less and used for the transportation of persons.

   An "**automobile**" does not include any of the following motor vehicles:
   a. motorcycles;
   b. motor-driven cycles;
   c. farm-type tractors or other self-propelled equipment designed for use principally off public roads;
   d. motor vehicles operated on rails or crawler treads;
   e. motor vehicles located for use as a residence;
   f. motor homes, as defined by Revised Code of Washington 46.04.305; or
   g. mopeds, as defined by Revised Code of Washington 46.04.304.
2. "**Funeral expenses**" means payment for reasonable **funeral expenses** incurred because of **bodily injury** sustained by an **insured person** in an accident.
3. "**Income continuation benefits**" means payment of an **insured person's** loss of income from work, subject to the following:
   a. income from work lost between the date of the accident and the14th day after the accident will not be paid;
   b. payments will end the earliest of:
      (i) the date on which the **insured person** is reasonably able to perform the duties of his or her usual occupation;
      (ii) 54 weeks from the date of the accident; or
      (iii) the date of the **insured person's** death; and
   c. income earned during the period **income continuation benefits** are being paid will be deducted from **income continuation benefits**.
4. "**Insured person**" means:
   a. **you**, a **relative**, or a **rated resident**; and
   b. any other person:
      (i) who sustains **bodily injury** while using or **occupying** a **covered auto** with **your** permission; or
      (ii) when struck by a **covered auto** while a pedestrian.

7

5. **Loss of services benefits** means reimbursement for payment to persons other than members of the **insured person's** household for expenses reasonably incurred for essential services actually rendered in lieu of those the **insured person** would have performed without compensation if the **insured person** had not sustained **bodily injury** in the accident. Payment for such expenses will end the earliest of:

   a. the date the **insured person** is reasonably able to perform such services;
   b. 52 weeks from the date of the accident; or
   c. the date of the **insured person's** death.

6. "**Medical and hospital benefits**" means payment of the reasonable and necessary expenses incurred by or on behalf of an **insured person** within three years of the date of the accident for health care services provided by persons licensed by law to render such services and for pharmaceuticals, prosthetic devices, eyeglasses, and necessary ambulance, hospital, and professional nursing services. To determine whether a charge for **medical and hospital benefits** is reasonable and necessary, **we** may consider outside sources of information of **our** choice, including, but not limited to:

   a. licensed, certified or registered health care professionals;
   b. medical examinations;
   c. medical file reviews; or
   d. computerized databases.

## EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART II.

Coverage under this Part II does not apply to **bodily injury**:

1. sustained by any person while **occupying** a **covered auto** while it is being used:
   a. to carry persons or property for compensation or a fee;
   b. for retail or wholesale delivery, including, but not limited to, the pickup, transport, or delivery of magazines, newspapers, mail, or food; or
   c. for **ride-sharing activity**.

   This exclusion does not apply to shared-expense car pools;

2. to any person who intentionally causes their own **bodily injury**;
3. resulting from any pre-arranged or organized racing or speed contest, or in practice or preparation for any such contest;
4. due to war, whether or not declared, or to an act or condition incident to war;
5. resulting from the radioactive, toxic, explosive, or other hazardous properties of nuclear material;
6. to **you**, a **relative**, or a **rated resident** while **occupying** a motor vehicle, other than a **covered auto** owned by **you** or furnished for **your** regular use;
7. to a **relative** while **occupying** a motor vehicle, other than a **covered auto** owned by the **relative** or furnished for the regular use of a **relative**;
8. to any person who sustains **bodily injury** while using an **automobile** in the commission of a felony; or
9. arising out of the use of a **covered auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**.

8

**LIMITS OF LIABILITY**

The Limits of Liability for losses or expenses incurred by or on behalf of one **insured person** because of **bodily injury** sustained in any one accident will be as follows:
1. $10,000 for **medical and hospital benefits**;
2. $10,000 for **income continuation benefits**, subject to a limit of $200 per week. However the combined weekly payment an **insured person** may receive under personal injury protection coverage, workers' compensation, disability insurance, or other **income continuation benefits** may not exceed 85 percent of the **insured person's** weekly income at the time of the accident;
3. $2,000 for **funeral expenses**; and
4. $5,000 for **loss of services benefits** subject to a limit of $40 per day, not to exceed $200 per week.

However, if **you** have paid the premium for Additional Personal Injury Protection Coverage, the Limits of Liability for losses or expenses incurred by or on behalf of one **insured person** because of **bodily injury** sustained in one accident will be as follows:
1. $35,000 for **medical and hospital benefits**;
2. $35,000 for **income continuation benefits**, subject to a limit of $700 per week. However the combined weekly payment an **insured person** may receive under personal injury protection coverage, workers' compensation, disability insurance, or other **income continuation benefits** may not exceed 85 percent of the **insured person's** weekly income at the time of the accident;
3. $2,000 for **funeral expenses**; and
4. $14,600 for **loss of services benefits** subject to a limit of $40 per day for up to one year from the date of the accident.

The Limits of Liability are the most **we** will pay for all losses and expenses incurred because of **bodily injury** to one **insured person** sustained in one accident, regardless of the number of:
1. claims made;
2. **covered autos**;
3. **insured persons**;
4. lawsuits brought;
5. **automobiles** involved in an accident; or
6. premiums paid.

Any amount payable under this Part II will be reduced by any amount paid or payable because of **bodily injury** under any of the following or similar laws:
1. workers' compensation law; or
2. medical or disability benefits law.

Payments under this Part II are limited to the amount of the actual loss or expense incurred.

**OTHER INSURANCE**

If there is other applicable **automobile** medical payments insurance or personal injury protection coverage for **medical and hospital benefits**, **we** will pay only **our** share of

9

the damages. **Our** share is the proportion that **our** Limit of Liability for **medical and hospital benefits** bears to the total of all applicable limits. Any insurance that **we** provide for an **insured person** while using, **occupying**, or when struck by an **automobile**, other than a **covered auto**, will be excess over any other medical payments or personal injury protection coverage.

## ARBITRATION

If **we** and an **insured person** cannot agree on the amount payable under this Part II and have agreed to submit the dispute to arbitration, the decision as to the amount payable under this Part II will be made by an arbitrator agreed to by the parties. If the parties cannot agree on an arbitrator within 30 days, then on joint application by **us** and the **insured person**, the arbitrator will be appointed by a court having jurisdiction.

Each party will pay half the costs of the arbitrator. Each party will pay their own expenses. Unless both parties agree otherwise, arbitration will take place in the county where the **insured person** resides. Local rules of procedure and evidence will apply.

The written decision of the arbitrator will be binding on the parties as to the amount of benefits payable under this Part II. The arbitrator will have no authority to award:
1. costs, expenses, interest or fees; or
2. an amount in excess of the Limit of Liability under this Part II.

### PART III—UNDERINSURED MOTORIST COVERAGE

## INSURING AGREEMENT—UNDERINSURED MOTORIST
## BODILY INJURY COVERAGE

If **you** pay the premium for this coverage, **we** will pay for damages that an **insured person** is legally entitled to recover from the owner or operator of an **underinsured motor vehicle** because of **bodily injury**:
1. sustained by an **insured person**;
2. caused by an accident; and
3. arising out of the ownership, maintenance or use of an **underinsured motor vehicle**.

## INSURING AGREEMENT—UNDERINSURED MOTORIST
## PROPERTY DAMAGE COVERAGE

If **you** pay the premium for this coverage, **we** will pay for damages that an **insured person** is legally entitled to recover from the owner or operator of an **underinsured motor vehicle** because of **property damage**:
1. sustained by an **insured person**;
2. caused by an **accident**; and
3. arising out of the ownership, maintenance, or use of an **underinsured motor vehicle**.

# ADDITIONAL DEFINITIONS

When used in this Part III:

1. "**Accident**" means an occurrence that is unexpected and unintended from the standpoint of the **insured person**.
2. "**Insured person**" means:
   a. **you**, a **relative**, or a **rated resident**;
   b. any person while operating a **covered auto** with the permission of **you**, a **relative**, or a **rated resident**;
   c. any person **occupying**, but not operating, a **covered auto**; and
   d. any person who is entitled to recover damages covered by this Part III because of **bodily injury** sustained by a person described in a., b. or c. above.
3. "**Phantom vehicle**" means a vehicle whose operator or owner cannot be identified and that causes an **accident** resulting in **bodily injury** to an **insured person** or **property damage**, and has no physical contact with the **insured person** or the vehicle that the **insured person** is **occupying** at the time of the **accident**, if:
   a. the facts of the **accident** can be corroborated by competent evidence other than **your** testimony or the testimony of an **insured person** having a claim under this Part III resulting from the **accident**; and
   b. the **insured person**, or someone on his or her behalf, reports the **accident** to the police or civil authority within 72 hours after the **accident**.
4. "**Property damage**" means:
   a. physical damage to or destruction of a **covered auto**; and
   b. damages for loss of use of a **covered auto** incurred by **you**, up to $30 per day for up to 30 days, resulting from physical damage to or destruction of that **covered auto**.

   "**Property damage**" does not include:
   a. damage to the contents of a **covered auto**; or
   b. any other form of property damage.
5. "**Underinsured motor vehicle**" means a land motor vehicle or trailer of any type:
   a. to which no bodily injury liability bond or policy applies at the time of the accident;
   b. to which a bodily injury liability bond or policy applies at the time of the accident, but the bonding or insuring company:
      (i) denies coverage; or
      (ii) is or becomes insolvent;
   c. that is a hit-and-run vehicle whose owner or operator cannot be identified and which strikes:
      (i) **you**, a **relative**, or a **rated resident**;
      (ii) a vehicle that **you**, a **relative**, or a **rated resident** are **occupying**; or
      (iii) a **covered auto**;
   d. that is a **phantom vehicle**;
   e. to which a liability bond or policy applies at the time of the accident, but the sum of all applicable limits of liability under all applicable bonds and policies is less than the damages that the **insured person** is legally entitled to recover.

11

An **underinsured motor vehicle** does not include any vehicle or equipment:

a. owned by **you**, a **relative**, or a **rated resident** or furnished or available for the regular use of **you**, a **relative**, or a **rated resident**. However, this exclusion to the definition of **underinsured motor vehicle** does not apply to a **covered auto** with respect to **bodily injury** to **you**, a **relative**, or a **rated resident**;

b. owned by any governmental unit or agency. However, this exclusion to the definition of **underinsured motor vehicle** does not apply if the governmental entity is unable to satisfy a claim because of financial inability or its insolvency;

c. operated on rails or crawler treads;

d. designed mainly for use off public roads, while not on public roads;

e. while located for use as a residence or premises; or

f. that is a **covered auto**. However, this limitation on the definition of **underinsured motor vehicle** does not apply to a **covered auto** with respect to **bodily injury** to **you**, a **relative**, or a **rated resident**.

## EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART III.

Coverage under this Part III will not apply:

1. to **bodily injury** sustained by any person while using or **occupying**:
   a. a **covered auto** while being used:
      (i) to carry persons or property for compensation or a fee;
      (ii) for retail or wholesale delivery, including, but not limited to, the pickup, transport or delivery of magazines, newspapers, mail or food; or
      (iii) for **ride-sharing activity**.
      This exclusion does not apply to shared-expense car pools;
   b. a motor vehicle that is owned by or available for the regular use of **you**, a **relative**, or a **rated resident**. This exclusion does not apply to a **covered auto** that is insured under this Part III; or
   c. a motorcycle or motor-driven cycle.
2. to **bodily injury** sustained by **you**, a **relative**, or a **rated resident** while using any vehicle, other than a **covered auto**, without the permission of the owner of the vehicle or the person in lawful possession of the vehicle;
3. directly or indirectly to benefit any insurer or self-insurer under any of the following or similar laws:
   a. workers' compensation law; or
   b. disability benefits law;
4. to any punitive or exemplary damages;
5. to **bodily injury** sustained by any person if that person or the legal representative of that person fails to promptly notify **us** about any tentative settlement;
6. to **bodily injury** or **property damage** if the **insured person** intended to cause the event for which a claim is made under this Part III;
7. to **property damage**:
   a. sustained while a **covered auto** is being used:
      (i) to carry persons or property for compensation or a fee, including, but not limited to, delivery of magazines, newspapers, food or any other products; or

12

This exclusion does not apply to shared-expense car pools;
b.  resulting from, or sustained during practice or preparation for:
    (i)   any pre-arranged or organized racing, stunting, speed, or demolition con-
          test or activity; or
    (ii)  any driving activity conducted on a permanent or temporary racetrack or
          racecourse;
c.  due to a nuclear reaction or radiation;
d.  for which insurance is afforded under a nuclear energy liability insurance con-
    tract; or
e.  to a **trailer**; or
8.  to **bodily injury** or **property damage** arising out of the use of a **covered auto**
    while being used in connection with a **personal vehicle sharing program**. This
    exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or
    a **rated resident**.

## LIMITS OF LIABILITY

The limit of liability shown on the **declarations page** for Underinsured Motorist
Coverage is the most **we** will pay regardless of the number of:
1.  claims made;
2.  **covered autos**;
3.  **insured persons**;
4.  lawsuits brought;
5.  vehicles involved in the accident; or
6.  premiums paid.

If **your declarations page** shows a split limit:
1.  the amount shown for "each person" is the most **we** will pay for all damages due to
    **bodily injury** to one person;
2.  subject to the "each person" limit, the amount shown for "each accident" is the most
    **we** will pay for all damages due to **bodily injury** sustained by two or more persons
    in any one accident; and
3.  any amount shown for **property damage** is the most **we** will pay for the aggregate
    of all **property damage** caused by any one **accident**.

The "each person" limit of liability includes the total of all claims made for **bodily injury**
to an **insured person** and all claims of others derived from such **bodily injury**, includ-
ing, but not limited to, emotional injury or mental anguish resulting from the **bodily in-
jury** of another or from witnessing the **bodily injury** to another, loss of society, loss of
companionship, loss of services, loss of consortium, and wrongful death.

If the **declarations page** shows that "combined single limit" or "CSL" applies, the
amount shown is the most **we** will pay for the total of all damages resulting from any
one accident. However, without changing this total limit of liability, **we** will comply with
any law that requires **us** to provide any separate limits.

13

The damages under this Part III will be reduced by all sums:

1. available to an **insured person** under the limits of liability under all liability insurance or bonds applicable to the owner or operator of the **underinsured motor vehicle**. This includes all available limits of liability under Part I—Liability to Others and Part IV—Damage to A Vehicle; and
2. paid by or for any other liable persons or organizations due to **bodily injury** to the **insured person**.

**Our** Limit of Liability under this Part III for **property damage** to a **covered auto** arising out of one **accident** is the lowest of:

1. the actual cash value of the **covered auto** at the time of the **accident**, reduced by the applicable deductible;
2. the amount necessary to replace the **covered auto**, reduced by the applicable deductible;
3. the amount necessary to repair the **covered auto** to its pre-loss condition, reduced by the applicable deductible; or
4. any Limit of Liability shown on the **declarations page** for "property damage" under this Part III.

Payments for **property damage** under this Part III are subject to the following provisions:

1. no more than one deductible will be applied to any one **accident**; and
2. the applicable deductible for **property damage** under this Part III for an **accident** with a hit-and-run vehicle or a **phantom vehicle** is $300. The applicable deductible for **property damage** under this Part III for all other **accidents** is $100.

**We** will not pay under this Part III any expenses paid or payable under Part II—Personal Injury Protection Coverage.

No one will be entitled to duplicate payments for the same elements of damages.

If multiple auto policies issued by **us** are in effect for **you**, **we** will pay no more than the highest limit of liability for this coverage available under any one policy.

## OTHER INSURANCE

If there is other applicable similar insurance, **we** will pay only **our** share of the loss. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits. If this policy and any other policy providing similar insurance apply to the same **accident**, the maximum limit of liability under all the policies shall be the highest applicable limit of liability under any one policy. However, any insurance **we** provide with respect to a vehicle **you** do not own will be excess over any other collectible insurance.

## ARBITRATION

If **we** and an **insured person** cannot agree on:

1. the legal liability of the operator or owner of an **underinsured motor vehicle**; or

14

2.   the amount of the damages sustained by the **insured person**;

this will be determined by arbitration if **we** and the **insured person** mutually agree to arbitration prior to the expiration of the bodily injury statute of limitations in the state in which the accident occurred. If **we** and the **insured person** do not agree to arbitration, then the legal liability of the operator or owner of the **underinsured motor vehicle**, and the amount of the damages sustained by the **insured person**, may be determined in a court of competent jurisdiction.

If **we** and an **insured person** have agreed to arbitration, the decision will be made by an arbitrator agreed to by the parties. If the parties cannot agree on an arbitrator within 30 days, then on joint application by the **insured person** and **us**, the third arbitrator will be appointed by a court having jurisdiction.

**We** will pay the costs and fees of the arbitrator. Each party will pay their own costs and fees that they incur, including but not limited to attorney fees and fees paid to medical or other expert witnesses.

Unless both parties agree otherwise, arbitration will take place in the county in which the **insured person** resides. Local rules of procedure and evidence will apply.

A decision by the arbitrator will be binding with respect to a determination of:
1.   the legal liability of the operator or owner of an **underinsured motor vehicle**; and
2.   the amount of the damages sustained by the **insured person**.
**We** cannot be bound by the arbitrator for any amount in excess of the limit of liability.

**We** and an **insured person** may agree to an alternate form of arbitration.

## PART IV—DAMAGE TO A VEHICLE

### INSURING AGREEMENT—COLLISION COVERAGE

If **you** pay the premium for this coverage, **we** will pay for sudden, direct and accidental loss to a:
1.   **covered auto**, including an attached **trailer**; or
2.   **non-owned auto**;
and its **custom parts or equipment**, resulting from **collision**.

In addition, **we** will pay the reasonable cost to replace any child safety seat damaged in an accident to which this coverage applies.

### INSURING AGREEMENT—COMPREHENSIVE COVERAGE

If **you** pay the premium for this coverage, **we** will pay for sudden, direct and accidental loss to a:
1.   **covered auto**, including an attached **trailer**; or
2.   **non-owned auto**;
and its **custom parts or equipment**, that is not caused by **collision**.

15

A loss not caused by **collision** includes:

1. contact with an animal (including a bird);
2. explosion or earthquake;
3. fire;
4. malicious mischief or vandalism;
5. missiles or falling objects;
6. riot or civil commotion;
7. theft or larceny;
8. windstorm, hail, water or flood; or
9. breakage of glass not caused by **collision**.

In addition, **we** will pay for:

1. reasonable transportation expenses incurred by **you** if a **covered auto** is stolen; and
2. loss of use damages that **you** are legally liable to pay if a **non-owned auto** is stolen.

A combined maximum of $900, not exceeding $30 per day, will apply to these additional benefits. The additional benefit for transportation expenses will not apply if **you** purchased Rental Reimbursement Coverage for the stolen **covered auto**.

Coverage for transportation expenses and loss of use damages begins 48 hours after **you** report the theft to **us** and ends the earliest of:

1. when the **auto** has been recovered and returned to **you** or its owner;
2. when the **auto** has been recovered and repaired;
3. when the **auto** has been replaced; or
4. 72 hours after **we** make an offer to settle the loss if the **auto** is deemed by **us** to be a total loss.

**We** must receive written proof of transportation expenses and loss of use damages.

### INSURING AGREEMENT—ADDITIONAL CUSTOM PARTS OR EQUIPMENT COVERAGE

**We** will pay for sudden, direct and accidental loss to **custom parts or equipment** on a **covered auto** for which this coverage has been purchased. This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **covered auto** and the loss is covered under one of those coverages. This coverage applies in addition to any coverage automatically provided for **custom parts or equipment** under Comprehensive Coverage or Collision Coverage.

### INSURING AGREEMENT—RENTAL REIMBURSEMENT COVERAGE

**We** will reimburse rental charges incurred when **you** rent an **auto** from a rental agency or auto repair shop due to a loss to a **covered auto** for which Rental Reimbursement Coverage has been purchased. This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **covered auto** and the loss is covered under one of those coverages.

Additional fees or charges for insurance, damage waivers, optional equipment, fuel, or accessories are not covered.

16

This coverage is limited to the each day limit shown on the **declarations page** for a maximum of 30 days.

If Rental Reimbursement Coverage applies, no other coverage under this policy for rental expenses will apply.

Rental charges will be reimbursed beginning:
1. when the **covered auto** cannot be driven due to a loss; or
2. if the **covered auto** can be driven, when **you** deliver the **covered auto** to an auto repair shop or one of **our** Service Centers for repairs due to the loss;

and ending the earliest of:
1. when the **covered auto** has been returned to **you**;
2. when the **covered auto** has been repaired;
3. when the **covered auto** has been replaced;
4. 72 hours after **we** make an offer to settle the loss if the **covered auto** is deemed by **us** to be a total loss; or
5. when **you** incur 30 days worth of rental charges.

**You** must provide **us** written proof of **your** rental charges to be reimbursed.

### INSURING AGREEMENT—LOAN/LEASE PAYOFF COVERAGE

If **you** pay the premium for this coverage, and the **covered auto** for which this coverage was purchased is deemed by **us** to be a total loss, **we** will pay, in addition to any amounts otherwise payable under this Part IV, the difference between:
1. the actual cash value of the **covered auto** at the time of the total loss; and
2. any greater amount the owner of the **covered auto** is legally obligated to pay under a written loan or lease agreement to which the **covered auto** is subject at the time of the total loss, reduced by:
   a. unpaid finance charges or refunds due to the owner for such charges;
   b. excess mileage charges or charges for wear and tear;
   c. charges for extended warranties or refunds due to the owner for extended warranties;
   d. charges for credit insurance or refunds due to the owner for credit insurance;
   e. past due payments and charges for past due payments; and
   f. collection or repossession expenses.

However, **our** payment under this coverage shall not exceed the limit of liability shown on the **declarations page**. The limit of liability is a percentage of the actual cash value of the **covered auto** at the time of the loss. This limitation does not apply to outstanding indebtedness secured by and incurred in conjunction with the purchase of a new **covered auto** that is added to this policy within 30 days of **your** becoming the owner. For purposes of this coverage, "new" means an **auto** that was not previously titled.

This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **covered auto** and the loss is covered under one of those coverages.

17

If **you** have purchased Collision coverage for at least one **covered auto** under **your** policy, and if **your pet** sustains injury or death while inside a **covered auto** or **non-owned auto** at the time of a loss covered under Collision or Comprehensive coverage, **we** will provide:

1. up to $1,000 for reasonable and customary veterinary fees incurred by **you**, a **relative**, or a **rated resident** if **your pet** is injured in, or as a direct result of, the covered loss; or
2. a $1,000 death benefit if **your pet** dies in, or as a direct result of, the covered loss, less any payment **we** made toward veterinary expenses for **your pet**.

In the event of a covered loss due to the theft of a **covered auto** or **non-owned auto**, **we** will provide the death benefit provided **your pet** is inside that auto at the time of the theft and **your pet** is not recovered.

### ADDITIONAL DEFINITIONS

When used in this Part IV:

1. "**Collision**" means the upset of a vehicle or its impact with another vehicle or object.
2. "**Custom parts or equipment**" means equipment, devices, accessories, enhancements and changes, other than those that are offered by the manufacturer specifically for that **auto** model, or that are installed by the auto dealership as part of the original sale of a new **auto**, that:
   a. are permanently installed or attached; and
   b. alter the appearance or performance of the **auto**.
3. "**Mechanical parts**" means operational parts on a vehicle that wear out over time or have a finite useful life or duration typically shorter than the life of the vehicle as a whole. **Mechanical parts** do not include external crash parts, wheels, paint, or windshields and other glass.
4. "**Non-owned auto**" means an **auto** that is not owned by or furnished or available for the regular use of **you**, a **relative**, or a **rated resident** while in the custody of or being operated by **you**, a **relative**, or a **rated resident** with the permission of the owner of the **auto** or the person in lawful possession of the **auto**.
5. "**Your pet**" means any dog or cat owned by **you**, a **relative**, or a **rated resident**.

### EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART IV.

Coverage under this Part IV will not apply for loss:

1. to any vehicle while being used:
   a. to carry persons or property for compensation or a fee;
   b. for retail or wholesale delivery, including, but not limited to, the pickup, transport or delivery of magazines, newspapers, mail or food; or
   c. for **ride-sharing activity**.
   This exclusion does not apply to shared-expense car pools;
2. to a **non-owned auto** while being maintained or used by a person while employed or engaged in any **auto business**;

18

3.   to any vehicle resulting from, or sustained during practice or preparation for:
      a.   any pre-arranged or organized racing, stunting, speed or demolition contest or activity; or
      b.   any driving activity conducted on a permanent or temporary racetrack or race-course;
4.   to any vehicle for which insurance:
      a.   is afforded under a nuclear energy liability insurance contract; or
      b.   would be afforded under a nuclear energy liability insurance contract but for its termination upon exhaustion of its limit of liability;
5.   to any vehicle caused by an intentional act of a person entitled to payment under this Part IV, or caused by an intentional act at the direction of a person entitled to payment, to the extent of that person's interest in that **covered auto**, even if the actual damage is different than that which was intended or expected;
6.   to a **covered auto** while it is leased or rented to others or given in exchange for compensation, including while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**;
7.   due to destruction or confiscation by governmental or civil authorities of any vehicle because **you**, any **relative**, or any **rated resident** engaged in illegal activities;
8.   to any vehicle that is due and confined to:
      a.   wear and tear;
      b.   freezing;
      c.   mechanical, electrical or electronic breakdown or failure; or
      d.   road damage to tires.
      This exclusion does not apply if the damage results from the theft of a vehicle;
9.   to portable equipment, devices, accessories, and any other personal effects that are not permanently installed. This includes, but is not limited to:
      a.   tapes, compact discs, cassettes, DVDs, and other recording or recorded media;
      b.   any case or other container designed for use in storing or carrying tapes, compact discs, cassettes, DVDs, or other recording or recorded media;
      c.   any device used for the detection or location of radar, laser, or other speed measuring equipment or its transmissions; and
      d.   CB radios, telephones, two-way mobile radios, DVD players, personal computers, personal digital assistants, or televisions;
10.  to any vehicle for diminution of value;
11.  to any vehicle caused directly or indirectly by:
      a.   war (declared or undeclared) or civil war;
      b.   warlike action by any military force of any government, sovereign, or other authority using military personnel or agents. This includes any action taken to hinder or defend against an actual or expected attack; or
      c.   insurrection, rebellion, revolution, usurped power, or any action taken by a governmental authority to hinder or defend against any of these acts;
12.  to any vehicle caused directly or indirectly by:
      a.   any accidental or intentional discharge, dispersal or release of radioactive, nuclear, pathogenic or poisonous biological material; or
      b.   any intentional discharge, dispersal or release of chemical or hazardous material for any purpose other than its safe and useful purpose; or

19

13. to any vehicle caused by, or reasonably expected to result from, a criminal act or omission of **you**, a **relative**, a **rated resident**, or the owner of a **non-owned auto**. This exclusion applies regardless of whether **you**, the **relative**, the **rated resident**, or the owner of the **non-owned auto** is actually charged with, or convicted of, a crime. For purposes of this exclusion, criminal acts or omissions do not include traffic violations; or

14. to a **covered auto** while used in connection with a **personal vehicle sharing program** or other similar program which engages in the business of facilitating the sharing of private passenger motor vehicles.

### LIMITS OF LIABILITY

1. The limit of liability for loss to a **covered auto**, **non-owned auto**, or **custom parts or equipment** is the lowest of:
   a. the actual cash value of the stolen or damaged property at the time of the loss reduced by the applicable deductible;
   b. the amount necessary to replace the stolen or damaged property reduced by the applicable deductible;
   c. the amount necessary to repair the damaged property to its pre-loss condition reduced by the applicable deductible; or
   d. the Stated Amount shown on the **declarations page** for that **covered auto**.
   However, the most **we** will pay for loss to:
   a. **custom parts or equipment** is $1,000 unless **you** purchased Additional Custom Parts or Equipment Coverage ("ACPE"). If **you** purchased ACPE, the most **we** will pay is $1,000 plus the amount of ACPE **you** purchased.
   b. a **trailer** is the limit of liability shown on the **declarations page** for that **trailer**. If the **trailer** is not shown on the **declarations page**, the limit of liability is $500.

2. Payments for loss to a **covered auto**, **non-owned auto**, or **custom parts or equipment** are subject to the following provisions:
   a. If coverage applies to a **non-owned auto**, **we** will provide the broadest coverage applicable to any **covered auto** shown on the **declarations page**.
   b. If **you** have elected a Stated Amount for a **covered auto**, the Stated Amount is the most **we** will pay for all loss to that **covered auto**, including its **custom parts or equipment**.
   c. Coverage for **custom parts or equipment** will not cause **our** limit of liability for loss to an **auto** under this Part IV to be increased to an amount in excess of the actual cash value of the **auto**, including its **custom parts or equipment**.
   d. In determining the amount necessary to repair damaged property to its pre-loss condition, the amount to be paid by **us**:
      (i) will not exceed the prevailing competitive labor rates charged in the area where the property is to be repaired and the cost of repair or replacement parts and equipment, as reasonably determined by **us**; and
      (ii) will be based on the cost of repair or replacement parts and equipment which may be new, reconditioned, remanufactured or used, including, but not limited to:
         (a) original manufacturer parts or equipment; and

20

(b) nonoriginal manufacturer parts of equipment.

    e. To determine the amount necessary to repair or replace the damaged property as referred to in subsection 1., the total cost of necessary repair or replacement may be reduced by unrepaired prior damage. Unrepaired prior damage includes broken, cracked or missing parts; rust; dents; scrapes; gouges; and peeling paint. The reduction for unrepaired prior damage is the cost of labor, parts and materials necessary to repair or replace damage, deterioration, defects, or wear and tear on exterior body parts, windshields and other glass, wheels, and paint, that existed prior to the accident and that is eliminated as a result of the repair or replacement of property damaged in the loss.

    f. To determine the amount necessary to repair or replace the damaged property as referred to in subsection 1., an adjustment may be made for betterment or depreciation and physical condition on:

      (i) batteries;

      (ii) tires;

      (iii) engines and transmissions, if the engine has greater than 80,000 miles; and

      (iv) any other **mechanical parts** that are nonfunctioning or inoperative.

    **We** will not make an adjustment for the labor costs associated with the replacement or repair of these parts.

    g. The actual cash value is determined by the market value, age, and condition of the vehicle at the time the loss occurs.

    h. any amount payable under this Part IV for loss to a **covered auto** will be reduced by any amount paid for the same elements of loss under Part III—Underinsured Motorist Coverage.

3. No deductible will apply to a loss to window glass when the glass is repaired instead of replaced.

4. Duplicate recovery for the same elements of damages is not permitted.

5. The following additional limits of liability apply to Pet Injury coverage:

    a. The most **we** will pay for all damages in any one loss is a total of $1,000 regardless of the number of dogs or cats involved.

    b. If **your pet** dies in, or as a direct result of, a covered loss, **we** will provide a death benefit of $1,000, less any payment **we** made toward veterinary expenses for **your pet**.

    c. No deductible shall apply to this coverage.

## PAYMENT OF LOSS

**We** may, at **our** option:

1. pay for the loss in money; or
2. repair or replace the damaged or stolen property.

At **our** expense, **we** may return any recovered stolen property to **you** or to the address shown on the **declarations page**, with payment for any damage resulting from the theft. **We** may keep all or part of the property at the agreed or appraised value.

We may settle any loss with **you** or the owner or lienholder of the property.

## NO BENEFIT TO BAILEE

Coverage under this Part IV will not directly or indirectly benefit any carrier or other bailee for hire.

## LOSS PAYABLE CLAUSE

1. Loss or damage, if any, under this policy shall be payable first to the loss payee or mortgagee (hereinafter called "secured party"), and, second, to **you** as the interests of each may appear; Provided, That, upon demand for separate settlement by the secured party, the amount of said loss will be paid directly to the secured party to the extent of its interest.

2. This insurance as to the interest of the secured party shall not be invalidated by any act or neglect of **you** in said policy or **your** agents, employees or representatives, nor by any change in the title or ownership of **your covered auto**; Provided, however, That the conversion, embezzlement or secretion by **you** or **your** agents, employees or representatives is not covered under said policy unless specifically insured against and premiums paid therefor.

3. In applying the pro rata provisions of the policy, the amount payable to the secured party shall be reduced only to the extent of pro rata payments receivable by the secured party under other policies.

4. **We** reserve the right to cancel the policy at any time as provided by its terms, but in such case **we** shall mail to the secured party a notice stating when such cancellation shall become effective as to the interest of said secured party. The amount and form of such notice shall not be less than that required to be given **you**, by law or by the policy provisions, whichever is more favorable to the secured party.

5. If **you** fail to render proof of loss within the time granted in the policy conditions, such secured party shall do so within sixty days after having knowledge of a loss, in form and manner as provided by the policy, and, further, shall be subject to the provisions of the policy relating to appraisal and the time of payment and bringing suit.

6. Whenever **we** shall pay the secured party any sum for loss or damage under policy and shall claim that, as to **you**, no liability exists, **we** shall, to the extent of such payment, be thereupon legally subrogated to all the rights of the party to whom such payment will be made, under all collateral held to secure the debt, or may, at **our** option, pay to the secured party the whole principal due or to grow due on the mortgage or other security agreement, with interest, and shall thereupon receive a full assignment and transfer of the mortgage or other security agreement and of all

22

collateral held to secure it, but no subrogation shall impair the right of the secured party to recover the full amount due it.

7. All notices sent to the secured party shall be sent to its last reported address, which must be stated in the policy.

The lienholder's interest will not be protected where the loss is otherwise not covered under the terms of this policy.

If this policy is cancelled, nonrenewed or voided, the interest of any lienholder under this agreement will also terminate.

## OTHER SOURCES OF RECOVERY

If other sources of recovery also cover the loss, **we** will pay only **our** share of the loss. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits. However, any insurance **we** provide for a **non-owned auto**, or **trailer** not shown on the **declarations page**, will be excess over any other collectible source of recovery including, but not limited to:
1. any coverage provided by the owner of the **non-owned auto** or **trailer**;
2. any other applicable physical damage insurance; and
3. any other source of recovery applicable to the loss.

## APPRAISAL

If **we** cannot agree with **you** on the amount of a loss, then **we** or **you** may demand an appraisal of the loss. Within 30 days of any demand for an appraisal, each party shall appoint a competent appraiser and shall notify the other party of that appraiser's identity. The appraisers will determine the amount of loss. If they fail to agree, the disagreement will be submitted to a qualified umpire chosen by the appraisers. If the two appraisers are unable to agree upon an umpire within 15 days, **we** or **you** may request that a judge of a court of record, in the county where **you** reside, select an umpire. The appraisers and umpire will determine the amount of loss. The amount of loss agreed to by both appraisers, or by one appraiser and the umpire, will be binding. **You** will pay **your** appraiser's fees and expenses. **We** will pay **our** appraiser's fees and expenses. All other expenses of the appraisal, including payment of the umpire if one is selected, will be shared equally between **us** and **you**. Neither **we** nor **you** waive any rights under this policy by agreeing to an appraisal.

## PART V—ROADSIDE ASSISTANCE COVERAGE

### INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay for **our** authorized service representative to provide the following services when necessary due to a **covered emergency**:
1. towing of a **covered disabled auto** to the nearest qualified repair facility; and

23

2. labor on a **covered disabled auto** at the place of disablement.

If a **covered disabled auto** is towed to any place other than the nearest qualified repair facility, **you** will be responsible for any additional charges incurred.

### ADDITIONAL DEFINITIONS

When used in this Part V:
1. "**Covered disabled auto**" means a **covered auto** for which this coverage has been purchased that sustains a **covered emergency**.
2. "**Covered emergency**" means a disablement that is a result of:
    a. mechanical or electrical breakdown;
    b. battery failure;
    c. insufficient supply of fuel, oil, water, or other fluid;
    d. flat tire;
    e. lock-out; or
    f. entrapment in snow, mud, water or sand within 100 feet of a road or highway.

### EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EX-CLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART V.

Coverage under this Part V will not apply to:
1. more than three **covered emergencies** for any single **covered auto** in a six-month period;
2. the cost of purchasing parts, fluid, lubricants, fuel, or replacement keys, or the labor to make replacement keys;
3. installation of products or material not related to the disablement;
4. labor not related to the disablement;
5. labor on a **covered disabled auto** for any time period in excess of 60 minutes per disablement;
6. towing or storage related to impound, abandonment, illegal parking, or other violations of law;
7. assistance with jacks, levelers, airbags or awnings;
8. labor or repair work performed at a service station, garage, or repair shop;
9. auto storage charges;
10. disablement that occurs on roads not regularly maintained, sand beaches, open fields, or areas designated as not passable due to construction, weather, or earth movement;
11. mounting or removing of snow tires or chains;
12. tire repair;
13. disablement that results from an intentional or willful act or action by **you**, a **relative**, or the operator of a **covered disabled auto**;
14. any **covered auto** while being used in connection with **ride-sharing activity**;
15. any **covered auto** while being used in connection with a **personal vehicle sharing program**; or
16. a trailer.

24

**UNAUTHORIZED SERVICE PROVIDER**

When service is rendered by a provider in the business of providing roadside assistance and towing services, other than one of **our** authorized service representatives, **we** will pay only reasonable charges, as determined by **us**, for:

1. towing of a **covered disabled auto** to the nearest qualified repair facility; and
2. labor on a **covered disabled auto** at the place of disablement;

which is necessary due to a **covered emergency**.

### OTHER INSURANCE

Any coverage provided under this Part V for service rendered by an unauthorized service provider will be excess over any other collectible insurance or towing protection coverage.

## PART VI—DUTIES IN CASE OF AN ACCIDENT OR LOSS

For coverage to apply under this policy, **you** or the person seeking coverage must promptly report each accident or loss even if **you** or the person seeking coverage is not at fault. **You** or the person seeking coverage must provide **us** with all accident or loss information, including time, place, and how the accident or loss happened. **You** or the person seeking coverage must also obtain and provide **us** the names and addresses of all persons involved in the accident or loss, the names and addresses of any witnesses, and the license plate numbers of the vehicles involved.

If **you** or the person seeking coverage cannot identify the owner or operator of a vehicle involved in the accident, or if theft or vandalism has occurred, **you** or the person seeking coverage must notify the police within 24 hours or as soon as practicable. However, if the person is seeking coverage under Part III—Underinsured Motorist Coverage for an accident involving a "phantom vehicle" as defined in Part III, then notice must be given to the police or civil authority within 72 hours of the accident.

A person seeking coverage must:

1. cooperate with **us** in any matter concerning a claim or lawsuit;
2. provide any written proof of loss **we** may reasonably require;
3. allow **us** to take signed and recorded statements, including sworn statements and examinations under oath, which **we** may conduct outside the presence of **you** or any other person seeking coverage, and answer all reasonable questions **we** may ask as often as **we** may reasonably require;
4. promptly call to notify **us** about any claim or lawsuit and send **us** any and all legal papers relating to the claim or suit;
5. attend hearings and trials as **we** require;
6. take reasonable steps after a loss to protect the **covered auto**, or any other vehicle for which coverage is sought, from further loss. **We** will pay reasonable expenses incurred in providing that protection. If failure to provide such protection results in further loss, any additional damages will not be covered under this policy;

25

7. allow **us** to have the damaged **covered auto**, or any other damaged vehicle for which coverage is sought, inspected and appraised before its repair or disposal;
8. submit to medical examinations at **our** expense by doctors **we** select as often as **we** may reasonably require; and
9. authorize **us** to obtain medical and other records.

## PART VII—GENERAL PROVISIONS

### POLICY PERIOD AND TERRITORY

This policy applies only to accidents and losses occurring during the policy period shown on the **declarations page** and that occur within a state, territory or possession of the United States of America, or a province or territory of Canada, or while a **covered auto** is being transported between their ports.

### CHANGES

This policy contract, **your** insurance application (which is made a part of this policy as if attached hereto), the **declarations page** (which is made a part of this policy as if attached hereto), and all endorsements to this policy issued by **us**, contain all the agreements between **you** and **us**. Subject to the following, the terms of this policy may not be changed or waived except by an endorsement issued by **us**.

The premium for this policy is based on information **we** received from **you** and other sources. **You** agree to cooperate with **us** in determining if this information is correct and complete, and to promptly notify **us** if it changes during the policy period. If this information is determined by **us** to be incorrect, incomplete, or if it changes during the policy period, **you** agree that **we** may adjust **your** policy information and premium accordingly. Changes that may result in a premium adjustment are contained in **our** rates and rules. These include, but are not limited to, **you**, a **relative**, or a **rated resident** obtaining a driver's license or operator's permit, or changes in:
1. the number, type or use classification of **covered autos**;
2. the persons who regularly operate a **covered auto**;
3. the persons of legal driving age residing in **your** household;
4. the residents in **your** household;
5. an operator's marital or domestic partnership status;
6. **your** mailing address and **your** residence address;
7. the principal garaging address of any **covered auto**;
8. coverage, deductibles, or limits of liability; or
9. rating territory or discount eligibility.

The coverage provided in **your** policy may be changed only by the issuance of a new policy or an endorsement by **us**. However, if during the policy period **we** broaden any coverage afforded under the current edition of **your** policy without additional premium charge, that change will automatically apply to **your** policy as of the date the coverage change is implemented in **your** state.

26

If **you** ask **us** to delete a vehicle from this policy, no coverage will apply to that vehicle as of the date and time **you** ask **us** to delete it.

## DUTY TO REPORT CHANGES

**You** must promptly report to **us** all changes, including additions and deletions, in policy information. This includes, but is not limited to, changes in:
1. **your** mailing address or **your** residence address;
2. the principal garaging address of any **covered auto**;
3. the residents in **your** household;
4. the persons of legal driving age residing in **your** household;
5. the persons who regularly operate a **covered auto**;
6. an operator's marital or domestic partnership status; or
7. the driver's license or operator's permit status of **you**, a **relative**, or a **rated resident.**

## SETTLEMENT OF CLAIMS

**We** may use estimating, appraisal, or injury evaluation systems to assist **us** in adjusting claims under this policy and to assist **us** in determining the amount of damages, expenses, or loss payable under this policy. Such systems may be developed by **us** or a third party and may include computer software, databases, and specialized technology.

## TERMS OF POLICY CONFORMED TO STATUTES

If any provision of this policy fails to conform to the statutes of the state listed on **your** application as **your** residence, the provision shall be deemed amended to conform to such statutes. All other provisions shall be given full force and effect. Any disputes as to the coverages provided or the provisions of this policy shall be governed by the law of the state listed on **your** application as **your** residence.

## TRANSFER OF INTEREST

The rights and duties under this policy may not be transferred to another person without **our** written consent. However, if a named insured shown on the **declarations page** dies, this policy will provide coverage until the end of the policy period for the legal representative of the named insured, while acting as such, and for persons covered under this policy on the date of the named insured's death.

## FRAUD OR MISREPRESENTATION

This policy was issued in reliance upon the information provided on **your** insurance application. Notwithstanding anything to the contrary in this policy or on **your declarations page**, **we** may void this policy at any time, including after the occurrence of an accident or loss, if **you**:
1. made incorrect statements or representations to **us** with regard to any material fact or circumstance;
2. concealed or misrepresented any material fact or circumstance; or

27

3.  engaged in fraudulent conduct;

with the intent to deceive at the time of application. This means that **we** will not be liable for any claims or damages that would otherwise be covered.

Any changes **we** make at **your** request to this policy after inception will be made in reliance upon information **you** provide. Notwithstanding anything to the contrary in the policy or on **your declarations page**, if **you**:
1.  make incorrect statements or representations to **us** with regard to any material fact or circumstance;
2.  conceal or misrepresent any material fact or circumstance; or
3.  engage in fraudulent conduct;

with the intent to deceive in connection with a requested change **we** may void the policy or reform it as it existed immediately prior to the requested change. **We** may do this at any time, including after the occurrence of an accident or loss.

When **we** have not voided or reformed the policy, **we** may still deny coverage for an accident or loss if **you**, in connection with the policy application, in connection with any requested change, or at any time during the policy period, have concealed or misrepresented any material fact or circumstance or engaged in fraudulent conduct with the intent to deceive and that concealment, misrepresentation, or fraudulent conduct was material to a risk **we** assumed.

**We** may deny coverage for an accident or loss if **you** or a person seeking coverage has concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct, with the intent to deceive in connection with the presentation or settlement of a claim.

### PAYMENT OF PREMIUM AND FEES

If **your** initial premium payment is by check, draft, electronic funds transfer, or similar form of remittance, coverage under this policy is conditioned on payment to **us** by the financial institution. Notwithstanding anything to the contrary in this policy or on **your declarations page**, if the financial institution upon presentment does not honor the check, draft, electronic funds transfer, or similar form of remittance, this policy may, at **our** option, be deemed void from its inception. This means **we** will not be liable under this policy for any claims or damages that would otherwise be covered if the check, draft, electronic funds transfer, or similar form of remittance had been honored by the financial institution. Any action by **us** to present the remittance for payment more than once shall not affect **our** right to void this policy.

In addition to premium, fees may be charged on **your** policy. **We** may charge fees for installment payments, late payments, and other transactions. Payments made on **your** policy will be applied first to fees, then to premium due.

### CANCELLATION

**You** may cancel this policy during the policy period by calling or writing **us** and stating the future date **you** wish the cancellation to be effective.

**We** may cancel this policy during the policy period by mailing a notice of cancellation that includes the reason for the cancellation to the named insured shown on the **declarations page** at the last known address appearing in **our** records.

**We** will give at least 10 days notice of cancellation if:
1.  **we** cancel during the first 30 days of the initial policy period; or
2.  the policy is cancelled for nonpayment of premium.

**We** will give at least 20 days notice of cancellation in all other cases.

**We** may cancel this policy for any reason if the notice is mailed within the first 60 days of the initial policy period.

After this policy is in effect for more than 60 days, or if this is a renewal or continuation policy, **we** may cancel only for one or more of the following reasons:
1.  nonpayment of premium;
2.  loss of driving privileges during the policy period, or, if this is a renewal policy, during the policy period or the 180 days immediately preceding the effective date of renewal, through suspension or revocation of **your** operator's license or the operator's license of any other operator who customarily operates a **covered auto**; or
3.  any other reason permitted by law.

Proof of mailing will be sufficient proof of notice. If this policy is cancelled, coverage will not be provided as of the effective date and time shown in the notice of cancellation. For purposes of cancellation, this policy is neither severable nor divisible. Any cancellation will be effective for all coverages for all persons and all vehicles.

## CANCELLATION REFUND

Upon cancellation, **you** may be entitled to a premium refund. However, **our** making or offering of a refund is not a condition of cancellation. **We** charge a policy fee for each policy term.

If this policy is cancelled, any refund due will be computed on a daily pro rata basis. However, **we** will retain a full policy fee if this policy is cancelled at **your** request. If cancellation is for nonpayment of premium, any refund will be computed on a daily pro rata basis.

## NONRENEWAL

If neither **we** nor one of **our** affiliates offers to renew or continue this policy, **we** will mail notice of nonrenewal to the named insured shown on the **declarations page** at the last known address appearing in **our** records. Proof of mailing will be sufficient proof of notice. Notice will be mailed at least 20 days before the end of the policy period.

29

**AUTOMATIC TERMINATION**

If **we** or an affiliate offers to renew or continue this policy and **you** or **your** representative does not accept, this policy will automatically terminate at the end of the current policy period. Failure to pay the required renewal or continuation premium when due will mean that **you** have not accepted **our** offer.

If **you** obtain other insurance on a **covered auto**, any similar insurance provided by this policy will terminate as to that **covered auto** on the effective date of the other insurance.

If a **covered auto** is sold or transferred to someone other than **you** or a **relative**, any insurance provided by this policy will terminate as to that **covered auto** on the effective date of the sale or transfer.

### LEGAL ACTION AGAINST US

**We** may not be sued unless there is full compliance with all the terms of this policy.

**We** may not be sued for payment under Part I—Liability To Others until the obligation of an insured person under Part I to pay is finally determined either by judgment after trial against that person or by written agreement of the insured person, the claimant, and **us**. No one will have any right to make **us** a party to a lawsuit to determine the liability of an insured person.

If **we** retain salvage, **we** have no duty to preserve or otherwise retain the salvage for any purpose, including evidence for any civil or criminal proceeding.

### OUR RIGHTS TO RECOVER PAYMENT

**We** are entitled to the rights of recovery that the insured person to whom payment was made has against another, to the extent of **our** payment. This right of recovery exists regardless of whether the insured person has been fully compensated for all damages, whether the insured person has a deductible under **our** policy, or whether others have paid for only a part of the insured person's loss. That insured person may be required to sign documents related to the recovery and must do whatever else **we** require to help **us** exercise those recovery rights, and do nothing after an accident or loss to prejudice those rights.

When an insured person has been paid by **us** and also recovers from another, the amount recovered will be held by the insured person in trust for **us** and reimbursed to **us** to the extent of **our** payment. **We** will be entitled to recovery only after the insured person has been fully compensated for damages arising out of the accident. If an insured person incurs attorney fees in connection with a lawsuit or arbitration to enforce benefits under Part III—Underinsured Motorist Coverage or under Part I—Liability to Others, any offset against benefits paid under Part II—Personal Injury Protection Coverage will be subject to a pro rata reduction for such attorney fees. If **we** are not reimbursed, **we** may pursue recovery of that amount directly against that insured person.

If an insured person recovers from another without **our** written consent, the insured person's right to payment under Part II—Personal Injury Protection Coverage and Part IV—Damage To A Vehicle will no longer exist to the extent that **our** right of recovery against the responsible party has been adversely affected.

If **we** elect to exercise **our** rights of recovery against another, **we** will include the insured's deductible in **our** recovery efforts unless specifically instructed by that person not to pursue the deductible. **We** have no obligation to pursue recovery against another for any loss not covered by this policy.

**We** reserve the right to compromise or settle the deductible and property damage claims against the responsible parties for less than the full amount. **We** also reserve the right to incur reasonable expenses and attorney fees in pursuit of the recovery.

Any recoveries received will be allocated first to the insured person for any deductible incurred in the loss. However, **we** will reduce reimbursement of the deductible based on the insured person's proportion of fault for the loss. If **we** hire an outside attorney to collect such recovery, **we** will also reduce reimbursement of the deductible based on a pro rata share of collection expenses and attorney fees incurred in connection with these recovery efforts.

These provisions will be applied in accordance with state law.

**JOINT AND INDIVIDUAL INTERESTS**

If there is more than one named insured on this policy, any named insured may cancel or change this policy. The action of one named insured will be binding on all persons provided coverage under this policy.

**BANKRUPTCY**

The bankruptcy or insolvency of an insured person will not relieve **us** of any obligations under this policy.

31

**PROGRESSIVE**®
*AUTO*

9611A WA 0716

# EXHIBIT B

# Vehicle Valuation Report

Prepared For  **Progressive Group of Insurance Companies**  (800) 321-9843


mitchell

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 19-5851930-01 | | COLLISION | LISA EVANS |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 07/31/2019 | 07/31/2019 | 08/01/2019 | 1009210980 | 1 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2008 | Dodge | Ram 1500 ST 4 Door Crew Cab 6 Foot Bed 5.7L 8 Cyl Gas A 4WD | WA 99021 | 117,039 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Brilliant Black Crystal Prl | | | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $10,330.40 |
| Condition - | $596.32 |
| Prior Damage | $0.00 |
| Aftermarket Parts + | $695.00 |
| Refurbishment | $0.00 |
| **Market Value =** | $10,429.08 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Deductible - | $500.00 |
| **Settlement Value =** | $9,929.08 |

## Settlement Value:

# $9,929.08

Mitchell **WorkCenter**
Total Loss
© 2018 Mitchell International, Inc. All Rights Reserved.

## Loss Vehicle Detail

Loss vehicle: 2008 Dodge Ram 1500 | ST 4 Door Crew Cab 6 Foot Bed | 5.7L 8 Cyl Gas A 4WD

## Standard Equipment

### Exterior

| | |
|---|---|
| Cargo lamp | Dark gray grille |
| Front air dam | Gray front bumper |
| Gray upper front fascia | Manual 6" x 9" black mirrors |
| Rear bumper w/gray step pad | Removable tailgate |
| Tinted windows | Variable speed intermittent windshield wipers |

### Interior

| | |
|---|---|
| 12V pwr outlet | Air conditioning |
| AM/FM stereo w/CD player-inc: (4) speakers | Auxiliary audio input jack |
| Black instrument panel bezel | Black vinyl floor covering |
| Cigar lighter | Day/night rearview mirror |
| Fixed long mast antenna | Folding rear seat |
| HD vinyl 40/20/40 split bench seat | Instrument cluster-inc: 120 MPH primary speedometer, tachometer |
| Mini floor console | Passenger assist handle |
| Pwr accessory delay | Rear underseat storage compartment |
| Sentry Key theft deterrent system | Tilt steering column |
| Tire pressure monitor | |

### Mechanical

| | |
|---|---|
| 136-amp alternator | 17" x 7" argent painted steel wheels |
| 3.55 axle ratio | 6.3' cargo box |
| 600-amp maintenance-free battery | 6700# GVWR |
| 9.25" rear axle ring gear diameter | Electric shift-on-the-fly part-time transfer case |
| Electronically controlled throttle | Four wheel drive |
| Front stabilizer bar | Full-size spare tire w/steel wheel & winch-type carrier |
| HD front & rear shock absorbers | P245/70R17 all-season BSW tires |
| Pwr 4-wheel disc brakes | Pwr rack & pinion steering |
| Rear wheel anti-lock brakes | Trailer tow wiring-inc: 4-pin connector |

### Safety

| | |
|---|---|
| Driver/front passenger multistage airbags | Dual note horn |
| Front shoulder belt height adjusters | |

## Packages



TRAILER TOW GROUP

-inc: 750-amp maintenance free battery, class IV hitch receiver, 7-pin wiring harness (w/EZB engine-inc: HD engine cooling)

## Optional Equipment

ANTI-SPIN REAR AXLE

**\*DIO/PIO =**    Dealer/Port Installed Options

# Loss Vehicle Base Value

Loss vehicle:  2008 Dodge Ram 1500 | ST 4 Door Crew Cab 6 Foot Bed | 5.7L 8 Cyl Gas A 4WD

## Comparable Vehicle Information

Search Radius used for this valuation: 150 miles from loss vehicle zip/postal code.

Typical Mileage for this vehicle: 131,000 miles

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2008 DODGE RAM 1500 ST REGULAR CAB PKP 8 4.7NORMAL GAS A 4WD | 81,125 | 83814 | 29 miles | $9,995.00 List Price | $8,430.69 |
| 2 | 2008 DODGE RAM 1500 ST REGULAR CAB PKP 6 3.7NORMAL GAS A 2WD | 84,950 | 99352 | 146 miles | $9,999.00 List Price | $10,392.65 |
| 3 | 2008 DODGE RAM 1500 ST REGULAR CAB PKP 8 4.7NORMAL GAS M 4WD | 76,000 | 59912 | 147 miles | $12,950.00 List Price | $12,167.86 |
| | | | | | **Base Value:** | **$10,330.40** |

# Loss Vehicle Adjustments

Loss vehicle:  2008 Dodge Ram 1500 | ST 4 Door Crew Cab 6 Foot Bed | 5.7L 8 Cyl Gas A 4WD



Mitchell WorkCenter
Total Loss

## Condition Adjustments

| Condition Adjustment:  -$596.32 | Overall Condition:  2.74-Good | Typical Vehicle Condition:  3.00 |
|---|---|---|

| Category | Condition | | Comments |
|---|---|---|---|
| Interior | | | |
| GLASS | 3 Good | | |
| DASH/CONSOLE | 3 Good | | |
| CARPET | 3 Good | | |
| SEATS | 2 Fair | | EXTENSIVE CREASING LTF |
| DOORS/INTERIOR PANELS | 3 Good | | |
| HEADLINER | 3 Good | | |
| Exterior | | | |
| BODY | 3 Good | | |
| VINYL/CONVERTIBLE TOP | Typical | | |
| PAINT | 2 Fair | | NUMEROUS SMALL SCRATCHES |
| TRIM | 2 Fair | | SINGLE LARGE IMPACT REAR BUMPER |
| Mechanical | | | |
| ENGINE | 3 Good | | |
| TRANSMISSION | 3 Good | | |
| Tire | 3 Good | | 10/32 RTF 9/32 LTF 7/32 RTR, LTR |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:

## After Market Parts and OEM Equipment Adjustments

| Category | Description | Adjustment Type | Purchase Date | Amount Paid | Adjustment Amount |
|---|---|---|---|---|---|
| EXTERIOR | AFTERMARKET WHEELS | INSTANT QUOTE | | | $155.00 |
| EXTERIOR | BED LINER (SPRAY-IN) | INSTANT QUOTE | | | $115.00 |
| MECHANICAL | LIFT KIT - FULL-SIZE VEHICLE (1-4 INCH) | INSTANT QUOTE | | | $405.00 |
| EXTERIOR | BUG GUARD | INSTANT QUOTE | | | $0.00 |
| INTERIOR | WINDOW TINT- CREW CAB | INSTANT QUOTE | | | $20.00 |

# Comparable Vehicles

Loss vehicle:  2008 Dodge Ram 1500 | ST 4 Door Crew Cab 6 Foot Bed | 5.7L 8 Cyl Gas A 4WD

Mitchell **WorkCenter™**
      **Total Loss**

| 1 | 2008 DODGE RAM 1500 ST REGULAR CAB PKP 8 4.7 NORMAL GAS A4WD | | List Price: $9,995.00 |
|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| | 10825 | 07/31/2019 | 83814 | 29 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
DALES USED CARS
1818 N 4TH ST
CDA ID 83814
208-667-4563

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$788.00 |
| Vehicle Configuration Adjustment | | | $1,246.89 |
| Mileage | 117,039 | 81,125 | -$1,048.18 |
| Equipment | | | |
| TRAILER TOW GROUP | Yes | Yes | -$7.83 |
| PROTECTION GROUP | No | Yes | -$45.96 |
| TRX4 OFF ROAD GROUP | No | Yes | -$341.42 |
| ANTI-SPIN REAR AXLE | Yes | TRX4 OFF ROAD GROUP | $103.16 |
| 24B SXT CUSTOMER PREFERRED ORDER SELECTION PKG | No | Yes | -$638.53 |
| SLIDING REAR WINDOW | No | Yes | -$44.44 |
| | | Total Adjustments: | -$1,564.31 |
| | | Adjusted Price: | $8,430.69 |

Comparable Vehicle Package Details:

TRAILER TOW GROUP

PROTECTION GROUP

TRX4 OFF ROAD GROUP  (ANTI-SPIN REAR AXLE, SIRIUS SATELLITE RADIO)

24B SXT CUSTOMER PREFERRED ORDER SELECTION PKG  (FRONT FLOOR MATS)

Comparable Vehicle Option Details:

SLIDING REAR WINDOW

| 2 | 2008 DODGE RAM 1500 ST REGULAR CAB PKP 6 3.7 NORMAL GAS A2WD | | | List Price: $9,999.00 |
|---|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| | HTT190536 | 07/22/2019 | 99352 | 146 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - VAST.COM
MCCURLEY INTEGRITY HONDA
1775 FOWLER STREET
RICHLAND WA 99352
509-547-5555

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$789.00 |
| Vehicle Configuration Adjustment | | | $2,797.85 |
| Mileage | 117,039 | 84,950 | -$1,099.50 |
| Equipment | | | |
| TRAILER TOW GROUP | Yes | No | $130.53 |
| 22B SXT CUSTOMER PREFERRED ORDER SELECTION PKG | No | Yes | -$764.72 |
| ANTI-SPIN REAR AXLE | Yes | No | $118.49 |
| | | Total Adjustments: | $393.65 |
| | | Adjusted Price: | $10,392.65 |

Comparable Vehicle Package Details:

22B SXT CUSTOMER PREFERRED ORDER SELECTION PKG  (FRONT FLOOR MATS)

| 3 | 2008 DODGE RAM 1500 ST REGULAR CAB PKP 8 4.7 NORMAL GAS M4WD | | | List Price: $12,950.00 |
|---|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| | S3004 | 06/21/2019 | 59912 | 147 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
BEKIER AUTO SALES
101 PHEASANT RD
COLUMBIA FALLS MT 59912
406-892-4407

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$1,021.00 |
| Vehicle Configuration Adjustment | | | $2,068.27 |
| Mileage | 117,039 | 76,000 | -$1,566.67 |
| Equipment | | | |
| TRAILER TOW GROUP | Yes | No | $152.15 |
| PROTECTION GROUP | No | Yes | -$62.14 |
| ELECTRONIC STABILITY PROGRAM | No | Yes | -$352.75 |
| | | Total Adjustments: | -$782.14 |
| | | Adjusted Price: | $12,167.86 |

Comparable Vehicle Package Details:

PROTECTION GROUP

Comparable Vehicle Option Details:

ANTI-SPIN REAR AXLE, ELECTRONIC STABILITY PROGRAM

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2008 Dodge Ram 1500 ST | 4 Door Crew Cab 6 Foot Bed 5.7L 8 Cyl Gas  4WD | $32,935.00 |
| 2008 DODGE RAM 1500 ST | REGULAR CAB PKP 8 4.7 NORMAL GAS A 4WD | $28,045.00 |
| 2008 DODGE RAM 1500 ST | REGULAR CAB PKP 6 3.7 NORMAL GAS A 2WD | $23,425.00 |
| 2008 DODGE RAM 1500 ST | REGULAR CAB PKP 8 4.7 NORMAL GAS M 4WD | $26,875.00 |

Claim # 19-5851930-01 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 7

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).
- Vehicle Configuration Adjustment- an adjustment for differences in configuration between the comparable vehicle and the loss vehicle (e.g. differences in trim).

- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.

- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.